MACKINTOSH *et al. v.* FLINT & P. M. R. Co. *et al.*

PARKER *et al. v.* SAME.

*(Circuit Court, E. D. Michigan.* March 22, 1888.)

1. RAILROAD COMPANIES—BONDS AND MORTGAGES—REORGANIZATION AGREEMENT —DIVERSION OF FUNDS.

A railroad being about to be foreclosed under a consolidated deed of trust, a committee of the consolidated bondholders, the members of which were large holders of stock and prior bonds, drafted "a plan for purchase and reorganization." This provided that the old stock should be deposited, and that the new company should issue (1) first mortgage 6 per cent. bonds, to be used only to fund the past due and maturing interest on the prior bonds, and for permanent construction and improvement; (2) preferred 7 per cent. stock, to represent the par value of outstanding consolidated bonds; and (3) common stock to represent the outstanding common stock. Holders of common stock were not to be entitled to shares, or to vote, until preferred stock had been paid five successive annual dividends of 7 per cent. The property was bought in, and a reincorporation effected on this basis. The new charter provided that the funds applicable to the payment of dividends on preferred stock was the net income, "after paying interest on prior bonds, repairs, expenses of equipment," etc., any surplus, after paying 7 per cent., to stand over until next dividend day. At the first meeting of the new board it was resolved that "under operating expenses only such improvements and additions shall be included as are necessary to keep the property efficient, and that all beyond this shall be provided for out of funds other than net earnings." *Held,* that the provisions of the agreement and the charter, as interpreted by the resolution, were binding upon the directors, and, it having been made to appear that the earnings and income, which had been wrongfully converted to pay for improvements and extensions, would, if applied to dividends, be sufficient to pay five successive dividends of 7 per cent. each on the preferred stock, that the common stock was entitled to representation.

2. SAME—RIGHTS OF COMMON STOCKHOLDERS—LIENS ON LAND GRANT.

Pursuant to an agreement for purchase and reorganization, a railroad company, which was about to be foreclosed under a consolidated trust deed, conveyed to the trustees of the separate mortgage of its land grant all its equities

therein, in trust to pay off all liens on the lands. and to turn in the balance to the trustees of the consolidated deed of trust. When the property was sold under this last trust, and bought in by the purchasing committee, these equities went with it. The land trustees paid off all liens, except one of $300,000, which was secured, in part, on other property, and from 1881 to 1885, both inclusive, had on hand fourfold security for that charge. *Held*, as between preferred stock and common stock. which latter under the charter was to be debarred from participation until the former had been paid successive dividends of 7 per cent. during those five years, that the surplus, after providing for the security of the $300,000 lien, was to be applied to dividends.

3. SAME—PREMIUMS ON MORTGAGE BONDS.

The same is true of premiums received by the company on first mortgage bonds issued and sold by it.

4. SAME—OPERATING EXPENSES.

As between such stockholders, a steel rail betterment should be charged to "construction account" and not to "operating expenses."

5. SAME.

The same is true as to money spent on steamers owned by the company to make them "more efficient;" and, where no "depreciation account" is kept, it is error to charge "expense account" with an estimated depreciation, when the money so charged was not actually spent upon repairs.

6. SAME—MONEY BORROWED TO PURCHASE ENGINE.

Nor, under such circumstances, should money borrowed by the company and laid out in the purchase of new freight engines and coal cars be charged to operating expenses.

7. SAME—PURCHASE OF OTHER ROADS—ACTION TO RESTRAIN—SUPPLEMENTAL BILL.

A suit having been brought by holders of common stock of a railroad company to compel the board of directors to recognize them as such, another bill to the same effect was filed by substantially the same parties, November 28, 1887, setting out, in addition that the defendant was about to buy in another road, and asking that the contemplated purchase, which was to take place two days later. be enjoined, on the ground that it was *ultra vires*, etc. The road about to be bought was improperly made a party to this bill. *Held*, the right to the relief demanded in the original bill having been established, that the second bill was properly a supplemental bill, and that, although it had been filed without the leave required by equity rule 57, it should, under the circumstances, be allowed to stand as to the defendant in the original suit.

8. SAME—RIGHT TO PURCHASE FRANCHISE OF OTHER ROADS.

There is nothing in the general railroad law of Michigan (act of 1873) authorizing one railway corporation to acquire the stock and franchises of another completed company, with the intention of itself exercising such franchises; and, in the absence of such a statute, such an acquisition is unlawful.

9. SAME—INJUNCTION.

Where holders of common stock of a railroad company are entitled to, but are deprived of, the right of representation, equity will enjoin, pending suit for the enforcement of such right. a disadvantageous, illegal, and *ultra vires* purchase by such company of another road.

In Equity. On final hearing.

*J. Lewis Stackpole, Alfred Russell*, and *Henry S. Dewey*, for complainants.

*William L. Webber* and *Henry M. Campbell*, for respondents.

JACKSON, J. The above-entitled causes were heard together. The first is filed by complainants on behalf of themselves and other holders of provisional certificates, as hereinafter explained, to compel the Flint & Pere Marquette *Railroad* Company and its directory to recognise them in full as stockholders in said company, and to issue to them regular

certificates of stock therein, such as will give them the rights of actual
stockholders in said corporation, entitle them to vote and exercise a voice
in the management of its affairs, from which they claim to be at present
unjustly and improperly excluded.   The second bill is filed by substan-
tially the same parties, asserting the same right, and seeking to enjoin
and restrain the Flint & Pere Marquette *Railroad* Company, in which
they claim the right to be admitted as actual stockholders, from purchas-
ing or leasing the Port Huron & Northwestern *Railway* Company, on
the grounds that such leasing or purchase would be injurious to their in-
terests, and unwarranted by law.   The questions presented by this sec-
ond bill, or, rather raised by the motion for preliminary injunction
thereunder, depend to a greater or less extent upon the conclusion which
the court may reach as to whether complainants, and those standing with
them in the same position with them, are entitled to be treated and re-
garded as present stockholders in the Flint & Pere Marquette Railroad
Company.   It will, therefore, be most proper first to consider the mat-
ter involved in the first of the above suits, and to determine the relations
which complainants bear to, and the rights which they may justly assert
in, the Flint & Pere Marquette *Railroad* Company.

   The material facts of this case, as disclosed by the bill, answer, ex-
hibits, and proofs, are these:  The Flint & Pere Marquette *Railway* Com-
pany, a corporation existing under the general railroad laws of Michigan,
in 1872, executed to W. W. Crapo, Andrew G. Pierce, and Publius V.
Rogers, as trustees, its consolidated trust deed or mortgage upon its fran-
chises and property of every description, (except certain land grants de-
rived from the United States through the state of Michigan, which had
been previously conveyed in special parcels, and by separate trusts to
secure certain bonds of the company,) for the purpose of securing the
payment of an issue of bonds, as provided for therein, to the amount of
$6,657,000, to be known and designated as "Consolidated Bonds" of
said railway company.   Between four and five millions of these consol-
idated bonds were actually issued, on which the company made default
in the payment of the interest thereon; and in June, 1879, said trustees
filed their bill in the United States circuit court for the Eastern district
of Michigan, at Detroit, for the foreclosure of said consolidated trust deed
and mortgage by a sale of the property and franchises covered thereby.
Shortly before the commencement of this suit, Jesse Hoyt, as president,
and H. C. Potter, as secretary, of said railway company, issued a circu-
lar to the stockholders and others interested, notifying them that fore-
closure proceedings were about to be instituted, explaining the situation
of the company affairs and informing them "that a plan for purchase
and reorganization will be prepared by a committee of the consolidated
bondholders at an early day."   Such committee, composed of H. A. V.
Post, as chairman, Francis Hathaway, A. G. Brower, H. H. Fish, and
Loum Snow, Jr., was appointed by the bondholders about the time of,
or soon after, the institution of the foreclosure proceedings.   This com-
mittee issued the reorganization scheme made Exhibit A to the bill of
complainants, which, so far as need be noticed, was as follows:

"(3) The new company to issue reorganized first mortgage six per cent. bonds, having thirty years to run, and redeemable, at the pleasure of the new company, at par and accrued interest. This mortgage to be used only to fund the past due and maturing interest on the prior bonds, and for such permanent construction and improvement as may be deemed desirable by the board of directors of the new company. (4) Preferred seven per cent. stock shall be issued, sufficient in amount to represent the par value of the outstanding consolidated bonds and the past due coupons to May 1, 1879, inclusive. This preferred stock shall always be entitled to one vote for each and every share. Payment of dividends of seven per cent., or any part thereof, on this preferred stock, will be contingent on the net earnings of the company, and without accumulation. (5) Common stock shall be issued, sufficient in amount to represent the outstanding common stock of the old Flint & Pere Marquette R. R. Co., and this stock shall not be entitled to vote until the new company shall have earned and paid, for five successive years, seven per cent. annual dividends on the preferred stock. (6) The preferred and common stock of the new company will be issued to the purchasing committee, who will deliver, or cause to be delivered, to the representatives, for the time being, of the holders of the eight per cent. consolidated bonds, and of the holders of the common stock of the old company, who may join in this scheme of reorganization, the amount *pro rata* to which they are entitled, as near as may be, and the purchasing committee will dispose of fractions for the benefit of the parties entitled thereto, in such manner as they may deem most expedient and equitable. (7) The benefit of these proceedings shall accrue only to those who shall deposit their securities and common stock with this committee within the time limited by them; it being understood that they may extend the same from time to time, as seems to them proper for the interests of all concerned. (8) The purchasing committee will issue certificates and stock that they may be entitled to." "(12) The general principles in this scheme, and the order of priority, and the respective amounts of these organization securities and stocks, being substantially maintained, the purchasing committee may change this scheme to meet any exigencies that may arise."

The defendants in their answer deny that this was the scheme actually adopted by the committee, and insist that the bondholders in fact agreed upon another and different plan, which did not contain any recognition, or make any provision for the common stockholders of the railway company. While there is some conflict in the testimony on this point, the decided weight of the evidence establishes to the satisfaction of the court that the reorganization scheme, as set out above in Exhibit A, was the one which the committee adopted, recognized, and acted upon. It was under this scheme that the consolidated bonds and stock certificates of the Flint & Pere Marquette Company were delivered by the holders thereof to the depositaries designated by the committee, and authorized to receive and receipt for the same. While the committee were engaged in getting the stock and consolidated bonds deposited under this reorganization scheme, and pending the foreclosure proceedings in the circuit court, the Flint & Pere Marquette Railway Company, the only defendant therein, by a conveyance, bearing date August 23, 1879, surrendered to W. W. Crapo and Oliver Prescott, trustees under the several land-grant mortgages, its equity of redemption, and all its right, title, and interest in the surplus lands and land funds then held or thereafter received by said trustees, after satisfying and discharging prior trusts, as an addi-

tional security for the payment of said consolidated bonds. This conveyance contained a general declaration of trust, and provided that, after satisfying the prior land-grant mortgages, the balance of said lands and the surplus of funds thence arising and held by said trustees, Crapo and Prescott, should be accounted for, and be by them transferred to the trustees of said consolidated mortgage or trust deed, so that such surplus funds and lands would inure to the benefit of said consolidated bonds, and become a part of the security for their payment. This conveyance and declaration of trust by the Flint & Pere Marquette Railway Company, made with the consent of the stockholders of said company, as the court must assume or presume, brought within the operation of the consolidated mortgage, then being enforced, the surplus lands and land funds held by Prescott and Crapo as trustees, after discharging prior liens, and gave the consolidated bondholders the benefit of an additional security worth several millions of dollars. Whether the general scheme of reorganization adopted by the committee formed the consideration or inducement for this large and valuable addition to the security of the consolidated bonds does not distinctly appear, but it is a fair and reasonable inference that the stockholders of the railway company then in default, and then being proceeded against, would not have consented to place their surplus land and land funds under the operation of the consolidated mortgage, at that time, without some well-founded expectation of being admitted into the new company that might be organized upon the ruins of the old. After the execution of this trust conveyance of August 23, 1879, a supplemental bill was filed immediately in said foreclosure proceeding by the trustees under both the consolidated and the land-grant mortgages, for the purpose of bringing this additional security under the decree of sale. Such proceedings were thereafter had under the original and supplemental bills as resulted, June 12, 1880, in a decree of the court, finding that the defendant corporation was in default; that the outstanding and unpaid consolidated bonds and interest coupons thereon, up to and including May 1, 1880, amounted to $6,236,368.80; that the trustees were entitled to have the property sold, as specified in the consolidated mortgage and in the trust conveyance of August 23, 1879; but directed that such sale should be made subject to certain prior claims mentioned in the pleadings, and particularly enumerated, as follows:

"(1) Such lawful claims as may be made under the trust deed dated April 6, 1862, and the bonds secured thereby, and referred to in the bill as the first (land) trust; (2) such lawful claims as may be made under the trust deed of September 25, 1866, and the bonds secured thereby, referred to in the bill as the second (land) trust; (3) such lawful claims as may be made under the trust deed dated September 4, 1868, and the bonds secured thereby, referred to in the bill as the third (land) trust deed; (4) such lawful claims as may be made under the trust deed and the bonds secured thereby on the Bay City Branch, amounting in the whole for principal, besides interest, to $175,000; (5) such lawful claims as may be made under the trust deed and mortgage dated September 4, 1868, and the bonds secured thereby, referred to in the pleadings as the Flint & Holly bonds; (6) such lawful claims as may be made under the trust deed and mortgage, dated January 2, 1871, and the bonds secured thereby, referred to in the pleadings as the Holly, Wayne & Monroe

bonds; (7) such claims as may be outstanding and unpaid against the receiver heretofore authorized, and such as may be hereafter authorized by this court."

The line of railway, as described in the bill, with all its property, rights, franchises, including things in action and equitable rights, together with the trusts as to the surplus lands and land funds, conveyed by the trust deed of August 23, 1879, were sold August 18, 1880, by a special master commissioner, duly appointed by the court, after advertising the sale as directed by the decree; and said Post, Fish, Snow, Brower, and Hathaway, as the purchasing committee under the aforesaid scheme of reorganization, became the purchasers at the price of $1,000,000, which, under the terms of the decree, was paid chiefly with consolidated bonds as cash. The sale was reported to the court, and the purchasing committee thereupon presented their petition to the court, setting forth that their said purchase was made pursuant to a scheme of reorganization before then agreed upon; that said purchasers and their associates had reorganized a corporation by the name of the "Flint & Pere Marquette Railroad Company," to take charge of, manage, and operate the railroad property so purchased under the decree, etc.; and praying that the special master commissioner might be ordered and directed to make a deed upon said sale direct to said newly-organized corporation. This order, after confirming the commissioner's report of sale, was passed by the court, and the special master commissioner, by deed bearing date September 28, 1880, formally conveyed and transferred to the new corporation, the Flint & Pere Marquette Railroad Company, all the property, rights, franchises, trusts, etc., so sold, as aforesaid. After the sale by the master commissioner, the purchasing committee, to whom the franchises, privileges, equitable rights and trusts were struck off, together with their associates, under date of August 31, 1880, filed with the secretary of state at Lansing, Mich., a "certificate of reorganization and articles of association of the Flint & Pere Marquette Railroad Company, successor to the Flint & Pere Marquette Railway Company." These articles of association, which constitute the charter, or organic law, of the new corporation, after reciting the aforegoing steps and proceedings, leading up to its formation, certify and declare, among other things not material to be noticed, as follows:

"Clause 2. The purpose for which said corporation is organized is to use, maintain, and enjoy, manage, and operate the said railroad and other property and franchises as aforesaid, including the right of using and enjoying the railroad, built, as aforesaid, and in use; and also for the purpose of extending such spurs and branches from time to time, as may be found useful and necessary for the purpose of developing and increasing the traffic of said road, and as may be authorized by law.

"Cl. 3. The present property of the corporation hereby organized consists of all the property of every kind and description, including franchises and rights sold and purchased under said decree, as aforesaid.

"Cl. 4. The capital stock of the corporation hereby organized shall be the sum of ten million dollars, in shares of one hundred dollars each, divided into two classes, to-wit: *First*, preferred stock, which shall consist of the sum of six million and five hundred thousand dollars, divided into sixty-five thousand shares, each share being the sum of one hundred dollars; *second*, com-

mon stock, consisting of three million five hundred thousand dollars, divided into thirty-five thousand shares of one hundred dollars each. And it is agreed that the rights of the holders of said preferred stock and said common stock shall be as hereinafter stated, to-wit: The holders of said preferred stock shall be entitled to receive from the earnings of said railroad company hereby organized, dividends to the amount of seven per cent. per annum, payable semi-annually or annually, as may be directed by the board of directors; provided the net income, after paying interest on prior bonds, repairs, expenses of equipment and renewals, shall be sufficient for that purpose, or such portions thereof as the said net income shall amount to. In case there shall be any surplus of net income after the payment of said dividend of seven per cent. upon the preferred stock, the same shall stand undivided until the next dividend day, and so from time to time and from year to year, until such time as the holders of said preferred stock shall receive five consecutive annual dividends of seven per cent., or semi-annual or quarterly dividends equivalent thereto. In case, on any dividend day, the net income as aforesaid shall not be sufficient to pay seven per cent. annual dividend to the holders of said preferred stock, such holders of preferred stock shall have no right to have the dividends made up out of subsequent earnings; it being the intention that there shall be no accumulation of claims against the company for dividends for such preferred stock. We further certify and declare that the said common stock shall not be issued, nor any portion thereof, until after the preferred stock shall have received five consecutive annual dividends of seven per cent. from the net income, as aforesaid, or other dividends equivalent thereto; nor shall said common stock be entitled to any representation at any meeting of stockholders until the same shall have been issued. When five consecutive annual dividends of seven per cent., or, in lieu thereof, semi-annual or quarterly dividends equivalent thereto, shall have been paid upon the preferred stock, then the common stock shall be issued and delivered to parties who may hold certificates issued upon the surrender of the common stock of the old Flint & Pere Marquette Railway Company, or other certificates which may be issued by this company in lieu thereof; and, if there shall be any surplus of common stock it shall be the property of the company hereby organized. After the common stock shall have been issued, as above provided, the preferred stockholders shall be entitled to receive from net earnings seven per cent. dividends each year before the common stock shall be entitled to participate; and after the payment of the seven per cent. to the holders of the preferred stock, any surplus of net earnings that may remain shall be paid as dividends, ratably, to the holders of the common stock, not exceeding seven per cent. in any one year. Should the net income be greater than sufficient to pay a dividend of seven per cent. upon the whole amount of stock, both preferred and common, such surplus shall be divided ratably among the holders of the preferred and common stock. Should the net income of the company, after the common stock shall have been issued, be insufficient to pay the dividends hereinbefore provided for in any single year, such deficiency shall not be made up out of the earnings of the subsequent year or years, and this shall apply both to preferred and common stock."

By the sixth article it is expressly declared that "the undersigned purchased said property at the sale under said decree in trust for themselves and others interested, pursuant to a scheme of reorganization heretofore agreed upon."

At the first meeting of the board of directors of the new corporation, held September 7, 1880, a resolution was adopted authorizing and directing the president and secretary to issue engraved or lithographed cer-

tificates, to be given to the committee of reorganization or their assigns, representing the beneficiary interest to be derived from the issue of common stock, when it may be issued, in accordance with the form then presented, which form was as follows:

"Certificate for Common Stock, when the same bill shall be issued.

"STATE OF MICHIGAN.

"*The Flint & Pere Marquette Railroad Company.*

"INCORPORATED AUGUST 31, 1880.

"This certificate will entitle ——— to ——— shares of the common stock of the Flint & Pere Marquette Railroad Company, when such stock shall be issued. Said common stock consists of 35,000 shares of $100 each, but will have no vote nor voice in the management until issued in accordance with the plan of organization, viz., when the preferred stock shall have received five consecutive annual dividends of seven per cent., or semi-annual or quarterly dividends equivalent thereto. This certificate is negotiable, and may be transferred on the books of the company in the city of New York on the surrender hereof. By order of the board of directors.

"*Dated East Saginaw,* ———, 1886. WM. W. CRAPO, President.

"H. C. POTTER, JR., Secretary.

"A. S. APGAR, Transfer Agent."

While the capital stock of the foreclosed company consisted of 35,000 shares of $100 each, making $3,500,000, only $3,298,200, or 32,982 shares of stock, had been actually issued. Of this actual issue there were deposited with the various depositaries designated by the reorganization committee, for the purpose of sharing in the reorganization scheme, and in pursuance of notice from the committee, stock certificates to the amount of $3,266,500, for which receipts were given by the several depositaries receiving the same, and for which the certificates in the form above stated, as directed by the board at its first meeting, September 7, 1880, were given in exchange. It appears from the testimony of Dr. H. C. Potter, whose relations to, and long connection with, the foreclosed company placed him in a position to know the fact, that when the foreclosure proceedings were commenced, and while the reorganization scheme was being arranged, the holders, or those interested in the old stock, were the same parties, or very largely so, who controlled the consolidated bonds that were in default, and prior bonds. This is an important fact, and should not be lost sight of in considering the questions involved in this case. It will be noticed that by the fifth and sixth clauses of the reorganization scheme both the preferred and common stock, or certificates therefor, were to be issued in favor of those who should join in the plan adopted, immediately upon the formation of the new company, although the common stock was not entitled to vote until the preferred stockholders had been paid seven per cent. annual dividends, for five successive years. This provision for the issuance of the common stock is changed by the fourth clause of the articles of reorganization, which declares "that said common stock shall not be issued, nor any portion thereof, until after the preferred stock shall have received five consecutive annual dividends of seven per cent. from the net income, as aforesaid, or other dividends equivalent thereto." In explanation of

this departure from or change in the reorganization scheme previously adopted, it is said that the committee's attorney advised them that under the laws of Michigan it would not be legal to actually issue common stock, and deprive it of the immediate right to vote. The provisional certificate issued to the old stockholders, as above set out, follows the provision of article 4 of the new company; and the complainants, being the holders of such certificates, acquired since the reorganization or formation of the new company, can only assert the rights which are conferred upon them by and under the fourth article of the reorganized company, and the contract expressed on the face of their certificates. Having acquired or accepted the present form of certificates, the complainants are fairly estopped from asserting claim for the issuance of the common stock, as contemplated by the scheme of reorganization. They are not in a position, nor do they make a case entitling them to have the articles of association, or charter of the new corporation so reformed as to conform to the reorganization scheme in respect to the issuance of common stock certificates.

On the part of the complainants it is claimed that the preferred stock, as provided for in the articles of association forming the new company, was unauthorized by the laws of Michigan; and on the part of defendants it is insisted that the provision in reference to the issuance of common or unpreferred stock was invalid, because founded upon no consideration moving from the old stockholders, or to the new company, and because that provision was in contravention both of the letter and spirit of the Michigan statute against stock watering, (act of 1859, 1 How. St. § 3409;)[1] and that the new corporation may rightfully refuse to recognize or issue said common stock. Neither of these positions, which were practically waived or abandoned on both sides at the hearing, can be successfully maintained. The act of Feb. 10, 1859, (1 How. St. § 3409,) clearly authorizes the issuance of preferred stock in cases like the present. It is equally clear that the stock watering provision of the statute (Id.) has no application. There was no fraudulent or unfair valuation of the property, franchises, privileges, or rights and trusts, which the promoters, consisting of lien claimants and stockholders of the old company, turned over to the new corporation, under the scheme of reorganization. Certainly there was nothing that could be called stock watering, within

---

[1] Sec. 3409. That it shall not be lawful for any railroad company existing by virtue of any of the laws of this state, nor for any officer of any such company, to sell, dispose of, or pledge any shares in the capital stock of such company, nor to issue certificates of shares in the capital stock of such company, until the shares so sold, disposed of, or pledged, and the shares for which such certificates are to be issued, shall have been fully paid; nor issue any stock or bonds except for money, labor, or property actually received, and applied to the purpose for which such corporation was created; and all fictitious stock dividends and other fictitious increase of the capital stock or indebtedness of any such corporation shall be void; and, if any officer or officers of any such company shall issue, sell, pledge, or dispose of any shares or certificates of shares of the capital stock of such company, in violation of the provisions of this act, such officer or officers so doing shall be deemed guilty of a misdemeanor, and upon conviction thereof shall be punished as provided by law in case of issuing false or fraudulent railroad stocks. The provisions of this act shall apply as fully to the stocks and officers of consolidated railroad companies, as existing in whole or in part within the state, as to original unconsolidated companies existing as aforesaid."

either the letter or the spirit of the Michigan statute. The case of *Railroad* v. *Dow*, 120 U. S. 287, 7 Sup. Ct. Rep. 482, is a conclusive authority in favor of the legality and validity of the reorganization in the present instance. The provision of the Arkansas constitution there under consideration was substantially the same as the Michigan statute; and a reorganization of a railroad company by purchasers at foreclosure sale, under circumstances undistinguishable in principle from the present, was sustained by the supreme court as not coming within the constitutional prohibition.

The objection of a want of consideration for the provision in reference to the common stock, cannot, for many reasons, avail the defendants; because there was ample consideration in the mutual agreements of the consolidated bondholders and the stockholders, under which the latter surrendered their certificates, and not only assented to the foreclosure, but, by the conveyance of August 23, 1879, provided an additional and valuable security in the shape of the surplus lands and land-grant funds held by Crapo and Prescott, trustees. The courts have not hesitated to recognize and give effect to such compromise arrangements between bondholders and stockholders in respect to corporations being foreclosed. In *Sage* v. *Railroad Co.*, 99 U. S. 343, Mr. Justice STRONG, speaking for the court, says:

"Let it be conceded that the new organization must be for the benefit of the holders of the first mortgage bonds, how can we say it is not for the benefit of those holders that entirely subordinate interests are conceded to junior lien creditors, and to the stockholders of the former corporation? How can we say that such a concession was beyond the discretion with which the agents of the bondholders—that is to say, the majority—were clothed? Such concessions are generally made in reorganizations of railroad companies, and they are regarded as beneficial to the joint lienholders. They prevent delay and expenditures arising out of litigation between creditors, which are sometimes almost ruinous, and they lessen the risk of redemptions."

"It is sometimes so far within the power of stockholders and unsecured creditors to embarrass and delay proceedings for the foreclosure of the mortgage and sale of the property that it is expedient for the mortgage creditors to arrange for a reorganization, and give up something of their own security for the sake of avoiding litigation and delay." Jones, Ry. Sec. § 614.

But, aside from the aforegoing considerations, which sufficiently dispose of the objection of a want of consideration for the provisional certificates or unpreferred stock, it should be borne in mind that the common stock in the old company was held largely by the consolidated bondholders, who, while accepting preferred stock for their bonds, naturally enough assented to the provision for the common stock. After the formation of the new company, its directors, selected alone by and from the preferred stockholders, issued the provisional certificates for common stock, which are not only recognized by the corporation, but become the subject of sale and transfer in the market; and now, after the original holders of these certificates, consisting to a considerable extent of the present directory, have disposed of their holdings, and when the present holders thereof seek to have their rights thereunder recognized and en-

forced, they are met with the objection, interposed by the same directory who issued these certificates, and by the corporation, whose charter recognized their existence, and provided for the issuance of the common stock represented thereby upon the happening of a certain contingency, that this common stock has no validity for want of consideration moving to the new corporation.  How can this new company dispute or call in question its own constitution, and the provision therein made for the issuance of common stock in a certain event?  How can preferred stockholders, or their representatives, the directors of the corporation, dispute the validity of the very clause of the organic act, which confers and establishes their own rights?  Such a proposition rests upon no principle, and is supported by no authority.  It is founded upon the idea that because the bondholders, by virtue of their lien, had superior rights over the stockholders of the old company, and could have exhausted its property to the utter exclusion of the stockholders, therefore, when they became preferred stockholders in the new company, they in some way carried with them the superior equities belonging to their former relation to the old concern.  This is, however, a mistake, and a fallacy.  Their right as bondholders ceased when their character of preferred stockholders began.  Their lien as bondholders, as well as their character of bondholders, was extinguished by the foreclosure sale, and the reorganization thereafter had in pursuance of the scheme previously adopted with their consent.  In forming the constitution of the new corporation, all prior equities existing under the old company were settled and extinguished; new relations were established, and new rights created.  Neither the new corporation, nor the preferred stockholders, nor the common stockholders, who have accepted, acted upon, and acquired rights and privileges under the reorganized company, can be heard, in contests among themselves, to question the organic law declaring and defining the beneficiaries of the legal being thus created.  Stockholders, preferred and unpreferred, are only entitled to such rights as the constitution of the new corporation, found in its articles of association, properly confer.  These rights the company cannot question; nor can it properly take sides in contests between the two sets of stockholders in respect to their relative rights, as defined by the act or articles of incorporation.

We come next to the main controversy in this case, which relates to the right of complainants, as holders of the provisional certificates for unpreferred shares, to have regular certificates of stock issued to them by the Flint & Pere Marquette Railroad Company.  This right is claimed on the ground that the event or contingency on which the provisional certificates holders were to become actual stockholders of the common class has, in the view of a court of equity, happened.  It is not claimed in the bill that the preferred stockholders have, in fact, received 7 per cent. annual dividends for five successive years.  It is alleged that the dividends actually paid on the preferred stock were 5½ per cent. in 1881, 6½ per cent. in 1882, 7 per cent. in 1883, 7 per cent. in 1884, and 4 per cent. in 1885; but it is charged the failure of the directors to declare and pay the the full 7 per cent. dividends each year for each of said

years was due to their neglect of duty, and intentional disregard of complainants' rights; that the net income of the company applicable to the payment of preference dividends, as defined by article 4 of the certificate of incorporation, was misappropriated, and diverted from its legitimate purpose, as contemplated and provided by said article, and applied to other uses in the interest and to the advantage of the preferred stockholders; "that the real and actual net income of these several years, if the affairs of said railroad company had been properly conducted and the accounts thereof kept with a legal and proper consideration of the rights of your orators, as hereinbefore set forth, together with the surpluses remaining on hand in each several preceding year, was, after paying interest on prior bonds, repairs, expenses of equipment and renewals, sufficient for the payment of a dividend of 7 per cent. in each of said years to the preferred stockholders; and that it was the duty of the defendant corporation to pay such dividend, and issue such common stock, on the 1st of January, 1886." It is further alleged that "the accounts of the company have been kept wholly in the interest of the preferred stockholders, and without regard to the interest of the common stockholders, and in disregard of the trust created, and with intent, on the part of the preferred stockholders and the officers and agents appointed by them, of preventing the common stockholders from having any voice whatever in the management, and with a view to postponing the issue of the common stock to an indefinite period. And your orators are informed and believe, and so aver, that, for this purpose, accounts have not been properly kept of permanent improvements in the property, which should have been paid for as additions to the plant, by way of construction and equipment, out of funds applicable thereto; but that said permanent improvements have been, in fact, paid for out of the current yearly income from the property applicable to dividends. And your orators show that earnings have been diverted from their proper application to dividends, and spent upon the railroad, and upon its road-bed, rails, track, station buildings, and other property, and in the building of branches, especially a branch to the city of Manistee, and in the building of side tracks and sidings, and the purchase and improvement of cars, engines, locomotives, and other equipments; that the operating expenses have in this way been unduly increased, and the net income diminished, all to the prejudice of the common stockholders, in violation of their rights and of the agreement, whether contained in the scheme of reorganization or in the certificate of organization filed with the secretary of state." The bill also alleges that the defendant corporation is entitled to the beneficial interest in the land grants and funds thence arising held by Crapo and Prescott, trustees; that, after satisfying all prior claims and demands thereon under the trust upon which they are held, there is a large surplus belonging to said defendants; that there was, on December 31, 1885, of this fund over $1,000,000 in bills receivable and cash, besides about 90,000 acres of unsold lands; that since the date of its reorganization in 1880, said corporation had received from said trustees many thousands of dollars, of which only a portion had been applied to construction

and equipment of its road; that said defendant has used sums received from the current operation of the road, which properly belong to the net income thereof, for the purposes of construction and equipment, in place of funds applicable thereto from the land department; and that the surplus lands and funds now in the hands of said trustees, and subject to the demands of the company, are properly applicable to dividends in place of the money from earnings and income diverted and applied to construction and equipment, etc. It is further alleged that complainants, and others in like situation, have applied to the management of the defendant company to correct these misapplications of earnings to construction purposes, and to respect the rights of the common stockholders; which requests have been totally disregarded. It is also charged that they have denied access to the books of account of the company. Aside from the preliminary injunction asked for, which was heard before Mr. Justice MATTHEWS, (32 Fed. Rep. 350,) the relief sought on this branch of the case is that the court will order such amounts from the surplus land funds to be paid into the income amount of the company, applicable to dividends, as will reimburse said income account for any and all sums wrongfully taken therefrom, and spent upon construction or equipment during the period aforesaid; that the defendant company may be ordered to furnish to complainants the accounts received by it from the trustees of the land department, and to render accounts of the sums paid over to it by said trustees; that a true and correct account be made up of the income of the defendant company, from the date of its organization, for each successive year, and that all improper charges to said income may be stricken out, and that any proper additions may be made thereto, and that a balance may be struck each year, and that the income of the succeeding year may be added to the surplus of the year preceding; that the defendant corporation, its officers and servants, be ordered by the court to issue stock certificates to the complainants severally, for the several amounts of shares to which they are entitled; that the defendants may be perpetually enjoined from depriving them of their legal rights as stockholders in voting at the meetings of stockholders, and in other respects; and, generally, that they may have such other and further relief as the nature of the case may require, and to the court may seem meet.

The defendants admit that the holders of preferred stock have been recognized as the only stockholders entitled to any voice in the management and control of the corporation since the time of its reorganization, and that the directors elected by them have had charge of the company and its management; but they deny that the holders of said preferred stock unlawfully combined together. They admit that they have refused to permit the complainants to send their agents into the offices of the defendant company, there to interfere with its business by an examination in detail of the transactions of the corporation; but state that the printed annual reports of the company were open to their inspection. They state, on information and belief, that the accounts of the company have been properly kept as such, and that "no greater amount has been

charged to operate expenses than sufficient to cover the actual expenses incurred." As to the charge "that earnings have been diverted from their proper application to dividends, and spent upon the railroad and upon its road-bed, rails, track, station buildings, and in the building of branches, etc., and in the building of side tracks and sidings, and in the purchase of cars, engines, locomotives, and other equipment; that the operating expenses have in this way been unduly increased and net income diminished, to the prejudice of the common stockholders, in violation of their rights and of the agreement, whether contained in the scheme of reorganization, or in the certificate of reorganization,"—there is no direct response or denial; but the defendants say they "admit that, as directors of said company, charged by the law with the duty of managing the same, they have believed that their duty to the public required that they should keep the road-bed, rails, track, station buildings, and other property in good condition; that they should keep the rolling stock sufficient to enable it to transact its business as the public interests might require; and these defendants believe that in so doing they promoted the true interests of the corporation in their charge, and also performed their duty in accordance with law; and therefore these defendants deny that the interests of complainants, or others in like state, were prejudiced, or their rights violated." They further "state and insist that their first duty in the management of the defendant corporation is to use the current income and funds for the purpose of maintaining the efficiency of the road, and the value of the property, that the same may not be depreciated, and that the same may be safely operated, and serve the public in accordance with the design of its creation." They also deny that the defendant corporation has received, from time to time, sums of money which should have been added to the net income applicable to dividends, and which they have neglected to add; they deny that the premium received on the sale of bonds should have been treated or applied as income; they deny that the railroad company is entitled to receive or has received from the land department income which should be added to its net yearly income, and be applicable to dividends; they deny that said land funds are applicable to dividends within the meaning and in accordance with the certificate of reorganization, now constituting the charter of said defendant company, "and state the fact to be that they have paid dividends from time to time to the holders of the preferred stock to such an extent as, in the judgment of the board of directors, it was prudent, legal, and honest to do; and they deny that a greater sum has been taken from income for the purpose of repairs, equipment, or other uses than what, in the judgment of the board of directors, the best interests of the property, and all interested therein, considered as a whole, absolutely required; and they deny that complainants, and others in like situation, as holders of provisional certificates aforesaid, have any rights which are superior to the public or of the preferred stockholders, or any rights which would require or justify the defendants, or any of them, to withhold money from needed and proper repairs and improvements, in order to force the contingency specified in the certifi-

cate of reorganization." They admit that dividends to the extent and percentage stated in the bill were declared and paid the preferred stockholders for the years mentioned; but they do not claim that full 7 per cent. dividends for each of said years could not have been paid.

The fourth article of the certificate of reorganization, forming a part of the defendant company's charter, was intended to define the legal relations and relative rights of the two classes of stockholders therein described, and to designate, as between them, the funds of the corporation out of which dividends on preferred stock were to be paid. By that provision of the charter, which is obligatory upon the corporation and its directory, the funds applicable to the payment of dividends on the preferred stock was the net income of the company, "after paying interest on prior bonds, repairs, expenses of equipment and renewals." Any surplus of net income, after the payment of said dividend of 7 per cent. upon the preferred stock, was to stand undivided until the next dividend day, and so on, from year to year, until such time as holders of said preferred stock should receive five consecutive annual dividends of 7 per cent., or semi-annual or quarterly dividends equivalent thereto. There was to be no accumulation of dividends on preferred stock. When five consecutive annual dividends, or, in lieu thereof, semi-annual or quarterly dividends equivalent thereto, shall have been paid upon the preferred stock, then the common stock, with the right to vote, was to be issued and delivered to parties who held the certificates issued upon the surrender of the common stock of the old Flint & Pere Marquette Railway Company, or other certificates, which the new company may have issued in lieu thereof. Any surplus of the common stock was to remain the property of the new corporation. At the first meeting of the board of directors under the new organization, a resolution was formally adopted, September 8, 1880, defining the policy of the company, as follows:

"Resolved that the board of directors define their policy to be in conformity to the articles of association; that, under the head of operating expenses, only such improvements and additions shall be included as are necessary, in the judgment of the directors, to keep the property up to the proper standard of efficiency, and that such portion of additions and extensions beyond this, as the board decides, shall be provided for out of funds other than net earnings; that the stockholders are entitled to the benefit of all net earnings after paying expenses and coupons."

This resolution was never repealed or modified; and, read in the light of the reorganization scheme, which provided for the issue of reorganized first mortgage 6 per cent. bonds, "to be used only to fund the past due and maturing interest on the prior bonds, and for such permanent construction and improvement as may be deemed desirable by the board of directors of the new company," it may fairly be regarded as a correct contemporaneous construction of the meaning and intention of article 4 of the charter, in respect to the duty of the new company and of its management, not only in making proper expenditures, but in keeping proper accounts, as between construction and permanent improvements, or additions and extensions, on the one hand, and operating expenses on the

other, upon which the respective rights of the two classes of stockholders were to be regulated, adjusted, and determined.   At the next meeting of the board, on the 22d day of September, 1880, a resolution was passed authorizing the issue of the new consolidated 6 per cent. bonds to the extent of $5,000,000, to be used and appropriated for certain specified purposes, among which, as designated in item 4 of the resolution, were "for such extensions of the road and improvements of the property, including the construction of the Manistee Railroad, the extension of the Saginaw & Clare County Railroad, and the purchase of the Saginaw & Mt. Pleasant Railroad, as may, in the judgment of the directors, be deemed expedient from time to time."   These bonds were to be secured upon all the property of the company, except the land assets and land-grant proceeds, held by Crapo and Prescott, trustees.   Dr. H. C. Potter was appointed general manager of the railroad company, entered upon his duties as such about October 1, 1880, and has since occupied that relation to the corporation, having the practical control of its business and operations, and directing the manner in which its expenditures should be charged, whether to operating or construction, and the keeping of its accounts, showing receipts and disbursements.   The evidence clearly establishes that the company expenditures for operating expenses, and for additions and extensions or permanent construction improvements, were not kept as directed by the resolution of September 8, 1880, nor as the company was bound to do by the fourth article of its charter, so as to preserve the rights of and discharge its obligations impartially between its two classes of stockholders.   While the board of directors exercised their proper and legitimate discretion in directing the new works,—additions, extensions, improvements, and equipment that should be made to the road,—they did not designate the account to which the expenditures thereby incurred should be charged.   The general manager, directly, or indirectly, through subordinate officers, indicated and directed to what account all expenditures should be charged and receipts credited.   In two instances his discretion was so far supervised by the board of directors as to direct $78,472.59, made up of several items, to be transferred from operating to construction account of the current year, which was done by resolution adopted December 19, 1884, and the depreciation on steamers to be reduced.   No question is made as to the correctness of the company's expenditures; but the claim on behalf of the complainants is that their rights have been ignored and disregarded in improperly charging portions of such expenditures to operating, rather than to construction, whereby the net income applicable to dividends under the charter defining their relations to the company and the preferred stockholders, have been reduced to their prejudice.   They further claim that receipts and revenues received have not been credited, as they should have been, to income account.   It distinctly appears from the testimony of its officers, that the accounts of the defendant company have not been kept with any reference to the rights of the common stockholders; that no regard has been paid to the provisions of the fourth article of the charter in the keeping of the accounts; that the road was not

operated with reference to the unpreferred stockholders at all. The general manager states that the books and accounts were kept, "as we· thought the proper way of doing and administering, with reference to its [the road's] permanence and safety. We have not operated it [the road] with reference to· them [the common stockholders] at all. We have operated it in accordance with the public benefit and the maintenance of the property." His manner of dealing with the expenditures of the road is fairly illustrated in the following ·question and answer, (Record, p. 260:) "*Question.* And therefore you think that the question as to whether a reduction of grade should be charged to construction or to operating expenses, is simply a matter for the general manager to decide according to the state of the finances? *Answer.* No, sir; according to his judgment." Not only were the rights of the common stockholders not recognized, or considered in the keeping of the company's accounts, but, as stated by the auditor, Mr. Ledlie, no account was kept to show the surplus of net income yearly after the payment of the 7 per cent. dividend on preferred stock, as provided for in said fourth article of the charter. The policy thus adopted and pursued by the actual management assumed that the contingent·rights and interests of the provisional certificate holders were entirely subject to the discretion of the directors, or those in control of the road, in deciding, not only what expenditures should be made, but how they should be charged, as between operating and construction. If this position is correct, and it lies with ·the directors selected by the preferred stockholders to determine how outlays made to meet what they may consider for the best interests of the corporation, or most beneficial to themselves and associates, or for what they may deem necessary in serving and discharging the company's duty to the public, shall be charged, whether to operating expenses, or to construction, then the ·provisional certificate holders are placed completely in the arbitrary power and at the mercy of the preferred stockholders, and the charter provision, made for their benefit, in pursuance of the reorganization agreement, is practically abrogated, and become utterly worthless. While the company, in the exercise of its franchises and the management of its business, undoubtedly owes duties to the public and to its creditors which are paramount to the right of its stockholders,·preferred and unpreferred, still this artificial body, called the "corporation," is after all but the representative of its stockholders, and exists mainly for their benefit; and in their interest it is to be governed, controlled, and administered according to the provisions of the charter which the state has conferred. In the absence of charter provisions restricting or qualifying their powers, directors have usually a large discretion in managing the affairs of the corporation, in keeping its accounts as to expenditures, and in deciding whether dividends have been earned and should he declared. While their discretion as to making dividends is not unlimited or conclusive, courts will not ordinarily interfere to supervise or control its honest and reasonable exercise on the ground that shareholders have no unconditional right to a division of profits. Tayl. Corp. §§ 562, 563, and notes. If, in the present case, the question was merely one relating

to the policy which the company should pursue, or if its duty to the public, or its obligations to its creditors, were involved in a way to affect the company's ability to perform such duty or discharge such obligation, then the aforegoing principles would properly apply. But the facts developed by the proof in the case do not warrant the suggestion that these paramount duties are in any way inconsistent with the company's fair and proper observance of its charter duty towards both classes of stockholders, or that the rights of provisional certificate holders could not be recognized and enforced without requiring the company to disregard and neglect its obligations either to creditors or to the public. The company is perfectly solvent; the demands of the creditors have been, and are being, promptly met; and in respect to the public, whose rights are set up as a justification of the policy pursued by the management in not considering the rights of the provisional certificate holders, there is now and has been no failure of duty on the part of the company. Its road has been maintained in first-class condition, comparing favorably with any line of railroad in the state of Michigan. Year by year its lines have been extended, its equipment enlarged, its tracks and buildings improved, and its efficiency increased. These results have been to a large extent accomplished by the application of earnings to construction purposes, notwithstanding the company had at its disposal funds from other sources more properly applicable to those objects; the general manager, as the representative of the directors, asserting and exercising the discretion of charging all expenditures either to operating expenses or to construction, as he deemed proper. Provisional certificate holders, in November, 1882, entered their protest against this course; but their complaint was utterly ignored by the board of directors, and their general manager continued to divert portions of the net income to permanent construction purposes. This refusal on the part of the directors to respect the rights of the common stock partakes more of disregard of duty than of error in judgment. It was a non-performance of official obligation, amounting to what the law considers a breach of trust, if the complaint was well-founded, and made by parties entitled to have their policy as to earnings changed.

But the position is broadly assumed in the answer and in the argument of counsel for defendants that the board of directors, being charged with the power and duty of managing the corporate property and franchises for the best interests of the company, and for the benefit of the public, had the right; and were entitled to dispose of and apply the net earnings of the company in the same way, or in as unrestricted manner, as they would have had if the charter had contained no such provisions as are found in article 4, and there had been but one class of stockholders; and that their discretion in appropriating net income for construction purposes, as they saw proper, and in withholding the same from dividends, could not, at the instance or upon the complaint of the contingent shareholders, be controlled by the court. Can this proposition be sustained without practically nullifying, or destroying article 4 of the charter? We think not. The reorganization scheme contemplated a fund applicable to construction and equipment other than earnings, and

the fourth article of the new corporate constitution undertook to define what expenditures should be borne by net income, as between the two classes of stockholders. The provisions of that article constitute some restriction upon, or qualification of, the powers of the board of directors, which may not, at their option, be disregarded or ignored. If that article of the organic law of the corporation confers upon the provisional certificate holders any rights or interests, even though contingent, there must co-exist with such rights the correlative duty on the part of the company and its management to observe and respect those rights, and especially so when the preference class are in exclusive control of the corporation. This correlative duty and obligation on the part of the company and its management necessarily implies and involves the keeping of proper accounts as between construction and operating expenses, and the proper application of net income to the purposes indicated, and only to those purposes, to the end that a fair opportunity may be allowed for the happening of the contingency on which the provisional certificate holders were to be admitted into the company. The true import and meaning of article 4 of the charter is that, when the company's net income, after paying certain specified charges and expenses, is sufficient to pay a 7 per cent. dividend on the preferred stock, it shall be so applied, provided the rights of creditors are not affected, and be continued for five successive years if in condition to do so from net income, to the end that provisional certificate holders may then be let into the company, and be entitled to a voice in its management, and to share in future earnings in excess of further 7 per cent. dividends. It operates as a charter direction to the management in the interests of the common stock, and limits the discretion which the directors might otherwise exercise in applying the net earnings, or net income of the company.

It may be true, as argued by defendant's counsel, that the preferred stockholders could not have compelled the board of directors, selected by themselves, to declare larger dividends than were declared and paid from 1881 to 1885, inclusive, as held by the supreme court in New York. *Railroad* v. *Nickals*, 119 U. S. 296, 7 Sup. Ct. Rep. 209, and similar authorities, which rest upon the principle that, in the absence of charter provisions controlling or modifying their usual powers, courts will not generally review or control the discretion of directors on the subject of making or withholding dividends, when honestly and fairly exercised. But the present does not fall within that class of cases, nor is it controlled by them, because the rights here asserted are charter rights, imposing charter duties, binding and obligatory upon both the company and its managing officers, and operating as restrictions and limitations upon the general discretion of the directory in dealing with the net income of the road as between the preferred and unpreferred stockholders. The question in the present case is not, therefore, what regular stockholders, having a voice or vote in the selection of the corporate management, may demand and enforce in the way of having dividends declared and paid; but it is whether the contingent shareholders, having no voice in the corporation or its direction, are entitled to have the company and its di-

rectors, selected by and from the preferred class, observe and respect their rights by carrying out the charter provisions in their favor. It is not a sound proposition, as applied to this case, that the directors, selected by and from the preferred class, have and may exercise the same discretion as against the provisional certificate holders in dealing with, disposing of, or applying the net income of the company, which they might be entitled to exercise as against the preferred stockholders. They were entitled, as between the two sets of stockholders, to employ the net income in paying interest on prior bonds, old or new; in making repairs upon the road, buildings, and other property of the company, so as to maintain their efficiency; and in meeting the expenses of equipment and renewals, which evidently refers to repairs upon and keeping up of the rolling stock of the company, but does not include the purchase of new equipment. The company from the start adopted this construction as to the expenditures chargeable against income, as shown by the resolution already referred to, passsed at the first meeting of the board of directors.

With this limitation upon the company and its directors in the way of expending earnings as between the two classes of shareholders, we may next consider what net income applicable to dividends were earned or received during the years 1881 to 1885, inclusive, and the manner in which the management of the company has dealt with or disposed of the same, or, generally, whether the company could reasonably and properly have declared and paid full 7 per cent. dividends during each of said years. As to the surplus lands and proceeds of land sales in the hands of Crapo and Prescott, these were undoubtedly equitable assets of the defendant company corporation, acquired under the trust conveyance of August 23, 1879, and the foreclosure sale, purchase, and reorganization in 1880. Subject to the prior mortgage lien, or liens on said lands, and land proceeds, the company was the beneficial owner thereof, and held the equitable title to the same. In respect to these surplus assets it had something more than the simple right to call the trustees to an accounting. It was the real equitable owner of the property; and the surplus thereof after satisfying prior incumbrances, belonged to the corporation, just as it held its other property subject to mortgage. As the obsolute owner of this equitable title and right in said surplus lands and proceeds arising from the same, whatever the company received from that source was as much a part of its income or revenues as if it had been derived from any other source, such as receipts from operating its road, or rents collected for the use of its cars or other property. Income is not limited to the gain which results from business and labor, but it includes as well the proceeds derived from the use or sale of property. Now, what is the situation of these land assets, and what revenues have been actually derived therefrom during the years in question, or could have been received from that source, without impairing or interfering with the rights of creditors? When the new company acquired its right to these lands and assets, the prior charges thereon amounted to about $2,000,000. Of those prior bonds remaining on January 1, 1881, (Report of company for 1880, p. 21,) there were $1,704,000 of 8 per cent. land-grant bonds,

and $300,000 of Flint & Holly 10 per cent. bonds. During 1881 the former were discharged, partly by funds in the hands of the trustees and partly by exchange of new 6 per cent. bonds of the company; so that, at the close of 1881, the $300,000 of Flint & Holly bonds constituted the only incumbrance on these land assets. They were also secured by a mortgage on the Flint & Holly branch of the company's lines of road. Now, on December 31, 1881, as shown by the company's annual report, the trustees had in their hands a balance of $575,978.77, arising from land sales, while the land commissioner who made the sale held bills receivable, amounting, principal and interest, to the sum of $902,058.73, and the unsold lands held by the trustees amounted to 138,454.28 acres, worth about $10 per acre. Here, then, were $2,863,577.88 of good assets in the hands of said trustees to secure $300,000 of 10 per cent. bonds, which were also secured by mortgage on one of the company's main branches. The cash balance in the hands of the trustees exceeded this bonded debt by $275,978.77. The dividend declared and paid for 1881 was 5½ per cent.,—less than 7 per cent. by 1½ per cent.,—which, on the whole $6,500,000 of preferred stock, amounted to $97,500. If this amount had been drawn by the company from the hands of the trustees, the full 7 per cent. could have been readily declared and paid without in the least impairing the security held by them for the payment of the $300,000 Flint & Holly bonds. On December 31, 1882, said trustees held a balance of $598,117.28. The bills receivable from sales of lands in the hands of the land commissioner amounted to $747,532.78, and there were unsold lands to the extent of 109,815½ acres, worth upon on average, say $9 per acre, or $988,340, making an aggregate of $2,133,-989.78, controlled and held by the trustees to secure said $300,000 of bonds. In 1882 the dividend declared and paid was 6½ per cent. The deficiency of ½ per cent., or $32,500, was actually in the hands of the company, as shown on page 6 of its annual report for that year. For that year it had a surplus of $35,613.52, after paying the 6½ per cent. dividend, which was carried over to 1883. It could have paid the 7 per cent. for the year 1882, without drawing on the land funds; but, if there had been an actual deficiency of income of $32,500 from other sources, it could have been withdrawn from the land assets, without in any wise impairing or endangering the security for the payment of the $300,000 bonds. In 1883 and 1884 full 7 per cent. dividends were declared and paid, leaving in the hands of said trustees large surplus assets, as follows, viz., on December 31, 1883, the balance in their hands was $681,259.29, the land commissioner held $627,021.55 in bills receivable, and their were 103,619.42 acres unsold, worth $932,574, aggregating $2,240,854.84 of available assets charged with only $300,000 of liability; on December 31, 1884, the balance in the hands of the trustees was $693,681.33, the bills receivable from lands sold were $492,334.14 and there were 101,009.27½-100 acres unsold, worth $900,000, aggregating $2,086,015.47 of security, charged with $300,000 of bonds. On December 31, 1885, there remained of unsold lands 95,914.22 acres, worth upon an average, say $6 per acre, or $575,485, and the trustees

held in their hands, as stated by Mr. Crapo, (pages 596,597 of the Record,) funds to the amount of $764,556; of that amount the sum of $579,-000, was invested in Flint & Pere Marquette Railroad new 6 per cent. bonds, while the balance, except perhaps a small cash deposit arising from daily receipts, was loaned out at interest,—partly to the defendant corporation, to whom this surplus fund belonged, and which paid interest thereon, which was charged to operating expenses.    For the year 1885 the company only declared and paid a dividend of 4 per cent. on the preferred stock.    The 3 per cent. shortage, amounting to $195,000, could readily, safely, and properly have been withdrawn from the large surplus in the hands of the trustees, without in the least impairing or endangering the security for the payment of the $300,000 of Flint & Holly bonds, which constituted the only charge against the funds and assets held by the trustees.    The $579,000 of Flint & Pere Marquette 6 per cent bonds, which the trustees held, were worth in the market, and are still worth, a premium ranging from 15 to 20 per cent.    If the deficiency of $195,000 had been withdrawn from the hands of the trustees, they would have still held $384,000 or more of the company's 6 per cents., worth a premium of 15 per cent., as security for the $300,000 of Flint & Holly bonds, beside unsold lands worth $575,485.    On the 31st December, 1886, the balance in hands of the trustees had swelled to $826,-852.73.    The $300,000 Flint & Holly bonds mature May 1, 1888.    To say nothing of the branch road mortgaged for their payment, the trustees have for years held, and now hold, funds and assets for the security of these bonds, exceeding fourfold the amount needed, or necessary for their payment.    This large surplus the company or its management have intentionally declined to draw upon for the purpose of making dividends, or of returning to income sums that were improperly charged to operating expenses, except in 1884, when the board of directors, after directing the general manager to transfer $78,472.59 from operating to construction account, called upon and received from said trustees $100,000, which was used in making the dividend of that year.    Why could not the $195,000 required to make up the 7 per cent. dividend for 1885 have been called for from the same source?    Why was it not called for and so applied?    The board of directors, by resolution passed December 13, 1883, "resolved, that the trustees of the land funds be authorized to pay over to the treasurer of the company, from time to time, all land funds which shall come into their hands, in excess of what may be required to pay the securities outstanding, for which said land funds have been specially pledged, and all such payments heretofore paid by them to the treasurer be confirmed and approved."    The land funds in the hands of the trustees at the close of 1885 in excess of what was required to pay the $300,000 of Flint & Holly bonds (the only securities outstanding and chargeable against said fund) was more than $400,000.    Out of this excess, $195,000, for 1885, could have been drawn either to apply on dividends, or to restore to income or earnings what had been diverted from that fund, and applied to construction or new equipment.    But, for some reason not explained, this was not done.

Now, aside from the $100,000 received from the trustees under the resolution of December 19, 1884, how has the company or its management dealt with the moneys actually received from these land trustees? It appears that from October 1, 1880, to the close of 1885, said trustees paid over to the treasurer of the company at various times, as requested, sums of money aggregating $1,221,168.62, and which was used by the company as follows, viz., $646,000 in paying off 8 per cent. land-grant bonds, $100,000 for Bay City & East Saginaw bonds, $22,118.09 for improvement of Bayou Spur property in East Saginaw, $81,000 for coupons on Flint & Holly bonds, $4,500 and $22,550.53 for interest received, and $345,000 for the company's use, and which went into the general treasury, and was used "according to the necessities of the company for pressing needs of any kind," as stated by the general manager. But this $345,000 is not credited to income or earning. In the keeping of the company's accounts the provisional certificate holders are not allowed any benefit from this receipt. It is not permitted to go into earnings or income account. If that had been allowed, it would have more than covered the shortage in the 7 per cent. dividends for the five years in question. In other words, if that sum had been treated as applicable to dividends, or as an equitable restoration to earnings or income of what had been applied to construction, full 7 per cent. dividends could have been declared and paid during the five consecutive years under consideration. But how were these large receipts from the land assets disposed of in the company's account? By reference to the annual report for 1884 (pages 15 and 24) of the vice-president and general manager, it will be seen that the sum of $1,105,276.97, received from sales of lands and premiums on bonds, (the latter item amounting to $164,-541.25,) was charged to depreciation, and deducted from the road-bed and equipment account of the company. This latter account was, at the same time, further reduced by a credit of $10,793.48, being the proceeds of narrow-gauge equipment, telegraph line, and portable engine sold. No depreciation account was kept by the company, as the general manager testified, (page 344, Record,) and, year by year, operating expenses, were charged with all repairs and expenses of equipment and renewals made or incurred in, about, or upon the road-bed, rolling stock, buildings, or other property of the company, as contemplated and provided by article 4 of the charter, and then, at the close of 1884, a lumping charge of $1,116,070.45 is made to depreciation, and deducted from the road-bed and equipment account. While doing this the management of the company, without reason and in disregard of the rights of the provisional certificate holders, keep large surplus land funds in reserve, portions of which it borrows from the trustees from time to time, and pays interest upon its own funds, which is charged to operating expenses, to the prejudice of the unpreferred stockholders, who are excluded from any voice in the management of the corporate affairs. The court is unable to understand upon what principle the receipts or revenues derived from the surplus land assets are to be distinguished from other income or earnings of the company applicable to the payment of dividends

under the facts of this case. These land assets were brought into the company by the consent of the old common stockholders, under the trust conveyance of August 23, 1879, made manifestly in furtherance of the reorganization scheme. But, whether that creates any equity or not in favor of the provisional certificate holders, they have the same interest in these land assets that they possess in other property of the company, and the funds derived from that source are just as applicable to the payment of dividends on the preferred stock, so as to meet the contingency on which the unpreferred class are to be let in, as revenues derived from operating the road, or renting its cars and dining stations. The principle announced in *St. John* v. *Railway Co.*, 22 Wall. 149, where it is said: "We are aware of no legal principle which would authorize the stockholders in question to analyze the business, select out a portion of it, and to say that the net earnings specified must be a predicate of that part and none other," applies here. So in *Ryan* v. *Railway Co.*, 21 Kan. 365, the court says, in considering the rights of stockholders in reference to the sources from which profits are made "that it is immaterial at what time or from what sources these profits may have been derived. It is wholly immaterial whether they have accrued from rents, the profits of the construction of the road, or from the sale of lands equitably belonging to the company, they are all incidents to the shares." Without reference, therefore, to the diversion of income, or the improper application of earnings to construction, or the charging to operating expense what properly belonged to construction account, but taking the company's reports as made, and the dividends annually declared on the net earnings there shown, it is clear that there was at the disposal of the company ample surplus land funds in addition to such net earnings, to have made and paid full 7 per cent. dividends for each of the years 1881, 1882, 1883, 1884, and 1885, without in any way impairing the rights of its creditors, or neglecting its duty to the public. In the judgment of the court, fair dealing and a due regard to the contingent rights of the provisional certificate holders, required of the management that funds thus at their disposal should have been applied in making the full 7 per cent. dividends for the five years, so as to let the unpreferred stockholders into their inheritance. Is it to be said in a court of conscience that the preferred stockholders in charge of the corporate management and affairs, may have at their disposal ample funds to meet the contingency, and comply with the event on which the unpreferred class are to be let into their rights; that they may arbitrarily decline or wrongfully neglect to receive and apply such funds, so that the happening of the contingency is thereby postponed, and that they, or the corporation controlled by them, may thereafter set up and rely upon such contingency as an excuse or defense against the admission of such unpreferred class into their corporate rights and privileges? To state this proposition is enough. A court of equity will not permit parties occupying towards each other either legal or trust relations, whether direct or through the instrumentality of an artificial body called a "corporation," thus to act, and thereby postpone or defeat the rights of the defendant class.

But, aside from the surplus land funds and assets, how stands the case in respect to income and earnings derived from other sources? Were they sufficient, if fairly and properly applied, according to the true meaning of the article 4 of the charter to have paid full 7 per cent. dividends on the preferred stock for the five consecutive years in question? This can only be determined by an analysis and examination of the company's accounts, showing receipts and disbursements during said period. It appears that the total issue of the company's new 6 per cent. bonds amounted to $3,924,000; that of these $1,058,000 were exchanged for 8 per cent. land-grant bonds; that the land trustees purchased over $500,000 of said bonds at par, and that the residue thereof were sold at a premium, ranging from 5 to 10 per cent. This premium on its bonds sold was received by the company as follows, viz.: $500 between October 1, 1880, and January, 1881; $107,257.25 during 1881; $34,702.50 in 1882; $12,136.50 in 1883; and $9,945 in 1884, aggregating $164,561.25. This premium was, at first, set upon the credit side of the company's ledger, or placed to the credit of construction, and afterwards, as shown by the annual report for 1884, (page 15) it was included in the amount of $1,105,276.97, charged to depreciation, and deducted from road-bed and equipment account. This premium was received by reason of the rate of interest which the bonds bore, and the ample security provided for their payment. Earnings were charged with the payment of that interest on account of which said premium was earned or received; and it would therefore seem to be proper to credit earnings or income with the amount of such premium. If income is burdened with a rate of interest which secures a profit on the bonds, then income is entitled to the benefit of that profit, just as it would be entitled to the profits made on any contract by the company. In crediting such premium to earnings and profits, there is no increase of the bonded debt, nor improper enlargement of the company's construction account. It is apparent that 5 per cent. bonds, secured as these were, could have been negotiated at par. In carrying 6 per cent., earnings are charged with the extra burden of $39,240 annually. It is, therefore, reasonable and proper that income should have the benefit of the profit which has been derived from the extra charge placed upon such income. The experts differ in opinion as to the proper disposal to be made of such premiums on bonds, and there is no uniformity in the practice of railroads in respect to such profits. In the judgment of this court, such premiums, in the present case, as between the two classes of stockholders, should have been credited to income during the respective years in which the same was received.

Next, as to the steel-rail account. At the close of 1880 the mileage on the main line of the road was 317.17 and 90.40 miles of sidings. Of the main line 200 miles were laid with steel rails. At the close of 1881 there were 345.16 miles in the main line and 111.29 in sidings and spurs, 283 miles of which were laid with steel rails (being an increase of 83 miles) during 1881, (page 5, annual report for 1881.) At the close of 1882 the main line and sidings amounted to 485.62 miles

laid with steel rails, being an increase in steel rails over 1881 of 19.72 miles. At the close of 1883 the main line was 361.31 miles; sidings and spurs 175.17; total 536.38 miles, with 341.31 miles on main line and 18 miles on branches laid with steel rails, being an increase in steel mileage over 1882 of 56.59 miles. At the close of 1884 there were 369.91 miles laid with steel rails, an increase over 1883 of about 10 miles. At the close of 1885 the main line, sidings, branches, and spurs amounted to 543.12 miles, of which 373.88 miles were laid in steel, an increase over 1884 of 3.97 miles of steel rails. Now, with the exception of some comparatively small amounts expended in 1884–85 on the yards at East Saginaw, Flint, and Evart, not a single dollar was charged to construction, or for betterments on the main line of the company's road for the years 1881 to 1885 inclusive. During that period about 15,772 tons of steel rails were purchased and paid for out of earnings. While the accounts of the company are in much confusion on that subject of these steel rails, it appears from defendant's Exhibit G that the cost of these rails, with freight and fittings, after deducting what was on hand at close of 1885, amounted to about $900,346.10, while the total amount charged to construction as against this expenditure for the same period was only $540,616.81, and this was on the construction account for branches, sidings, spurs, and yards. Earnings were burdened with the difference, exceeding $350,000. Brown, the road-master, places the cost of steel rails during said period at $737,063.82. If from this is deducted the $540,516.81, charged to construction there will be left $196,547.01, which was borne by earnings for purchase cost of steel rails. The practice of the management was to remove the old iron rails from the main track, and use these in laying sidings, as required, and to put new steel rails in the main track in place of the old iron rails taken up. The difference between the cost of the new steel rail laid down on the main line, and as laid down, and the value of the old iron rail taken up, was charged to operating expenses, under the head of repairs to roadway, or "track repairs." Thus, in the report for 1881, it is stated that 4,000 tons of steel rails were laid down on the road. The cost of this, less the value of old rails removed, was fixed at $133,-779.09, which was charged to operating expenses, as "track repairs." The purchase cost of this 4,000 tons of steel rails, with fittings, to say nothing of the expense of making the change, was $240,000. In 1882 a similar charge was made to operating expenses for steel rails put down, to the amount of $31,224.56. During that year there were laid 1,697 tons of steel rails which cost $36,365. In 1883 the increase in steel-rail mileage on main track and sidings was 56.59 miles. Counting 38 tons to the mile, and the cost of steel rails at $37 per ton, this increased cost of steel rails alone was $184,257.04. For 1884 the cost of the steel rails used on the main line was about $32,560; and in 1885 about $12,926.32, aggregating $371,850 for steel-rail betterments, which was charged to operating expenses, and taken out of earnings. The complainants' expert, Jones, makes this expenditure for 1881, 1882, and 1883, as shown by defendant's Exhibit G, amount to $250,465. By taking the total

cost of steel rails and deducting therefrom the amount charged to con-struction, old scrap rails sold, and what was on hand at the close of 1885, he makes this expenditure amount to $277,035.41, which, in the judg-ment of the court, is a most reasonable estimate; below, rather than above, the actual outlay for steel rails used in improving the track. The old iron rails, together with some light-weight steel rails taken from the main line, were used in sidings, spurs, and branches. A portion of these were charged to construction account, the old rails being charged at their estimated value. But a considerable portion of such sidings, spurs, and branches, as shown by the road-master, Brown, were made at the expense of earnings. The extension of sidings and spurs from October 1, 1880, to December 31, 1881, thus charged to operating ex-penses, was something over 12 miles, of which the estimated cost, as made by the road-master, was $45,430. For 1882 there were 2.41 miles of net extension made at the expense of earnings, involving an estimated expenditure of $9,640. In 1884 there were 4.29 miles of net increase in such extensions, involving, as estimated by the road-master, an ex-penditure of $16,690. In 1884 the net increase of such sidings was 3.82 miles, involving an expense of $11,460; and in 1885 there was a net in-crease of sidings to the extent of 2.59 miles costing $5,400, aggregating, during the five years, $88,890. If the whole cost of the steel-rail better-ments placed upon the road had been charged to construction account, as it should properly have been, as between the two sets of stockholders, then the items making up this aggregate of $88,890 might properly have been borne by earnings as operating expense; but, instead of doing this, the road-bed, or track, is improved by substituting new steel rails for old iron rails; the difference in their value is charged to operating expense, and taken out of earnings; and then, when the old rail is used for sid-ings and spurs, it is charged sometimes, when the management think proper and so direct, to construction, and at other times no charge is made to construction; and the whole expense of the change, and the en-tire cost of the siding or spur is made to fall upon the earnings. The "repairs," which article 4 of the charter provided should be paid out of net income, did not, as between the preferred and unpreferred, or pro-visional stockholders, warrant this method of dealing with the earnings of the company. It was neither just nor fair towards the latter class. Its effect was, not to keep the track in repair,—in the same state of effi-ciency as it existed in on October 1, 1880,—but to improve and enhance its value at the expense of earnings, which are thus reduced, and the provisional stockholders correspondingly postponed in coming into the company. If necessary to the assertion of complainants' rights, this court would order the whole steel-rail account to be charged to construc-tion, and earnings credited back with all that has been expended there-from for or on account of steel rails and steel improvements. But, with-out changing the account to that extent, the conclusion of the court is that at least $250,000 should be charged to construction on account of steel rails laid in the main tracks, and for outlays connected therewith, such as cost of work train, transportation of materials, etc., and that this

sum should be credited back to earnings; and further, that earnings should be credited, and construction charged, with the $88,890 expended on sidings, as above stated. The expert testimony in the case warrants these changes, which are, moreover, within the true meaning and reasonable intent of the charter provisions of the company, on which the rights of both classes of stockholders depend.

Again, in 1883 two steamers owned by the company were enlarged and made more efficient, at a cost of $40,286.44, which was paid out of and charged to earnings. This change was made in the steamers to meet the demands of a new class or character of business, which sprang up shortly before, across Lake Michigan to Milwaukee. It was an addition of substantial and permanent character, which increased the value of the steamers to that extent, and the cost of the change should, in the opinion of the court, be charged to construction. It was actually charged to operating expenses, and taken out of earnings. This should be corrected by crediting that amount back to earnings for the year 1883. In 1884 there was a charge against expenses for depreciation on these steamers amounting to $6,000. In 1885 there was a like charge for depreciation, and also a charge of $2,500, as depreciation on dining-halls, the three charges making $14,500. These sums were not actually expended out of earnings, but were estimated and charged against operating expenses. This was not proper. No depreciation account was either kept or warranted by the charter as between the two classes of stockholders, and, no expenditure having actually been made to meet such depreciation, the estimated amount thereof could not properly be deducted from earnings, or net income. *U. S.* v. *Railway Co.*, 99 U. S. 459. The sum of $6,000 should therefore be credited back to earnings for 1884, and $8,500 for 1885.

In the spring of 1884, $142,000 was expended, under the orders of the board of directors, for 8 new freight engines and 200 coal cars. The funds for this purchase were raised by loan, which was paid off by the company at the rate of $3,000 per month, and the sum so paid, in addition to interest on the loan, was charged to operating expenses, and withdrawn from earnings. See Reports for 1884, pp. 8, 23, for 1885, p. 8. This was clearly an improper charge against operating expenses. The outlay was not for the repair or renewal of old, but for the purchase of new, equipment, and should have been charged to construction. Fifteen thousand dollars were thus wrongfully charged in 1884, and $36,000 in 1885. These amounts should be credited to earnings for said years, respectively, and be charged to construction account.

During the years 1882, 1883, and 1884, earnings were charged with interest on temporary loans to the extent of $24,958.90. Whether these constitute a proper charge against net income or earnings, under the provisions of article 4 of the charter, admits of considerable question; but in the view which the court takes of other items of the company's accounts, as between construction and operating expenses, it is not necessary to pass upon the point. So, too, in reference to the sum of $4,225.28, charged to profit and loss on an old claim brought over from

assets of the receiver. There are various other items which complainants insist, and which the experts testify, should not be charged to operating expenses, or which should go to construction, or be credited to earnings, but they need not be specially noticed, except as to dividend on the company's securities. A word of explanation is necessary as to this source of income. The whole $6,500,000 of preferred stock was not actually issued. Only $6,342,000 was issued, leaving in the hands of the company $158,000 of said preferred stock, the dividend on which the management credited to net income or earnings, as dividends on the entire $6,500,000 were charged against such earnings. If 7 per cent. annual dividends are to be charged on the whole preferred stock of $6,500,000, then the company should credit earnings annually with $11,060, being 7 per cent. on the $158,000 of stock still held by the company; or, in stating the account of earnings over operating expenses, said dividend should be charged only on the preferred stock actually issued, amounting to $6,342,000, making the annual dividend charge $443,940, instead of $455,000, as shown by the reports. The result will be the same under either method. It appears that the company's net earnings for the period from October 1, 1880, to December 31, 1880, was $132,-584.69. If there is added to this the sum of $500,—the premium on bonds sold during that period,—we have the sum of $133,084.69 of income to be carried forward as applicable to dividends for 1881. Then, taking the net earnings and adding thereto the corrections, or credits due to earnings, as above indicated, the account for the several years will stand as follows:

| | | |
|---|---:|---:|
| Amount over from 1880 and applicable to dividends, - | | $133,084 69 |
| Net earnings, as reported by company, for 1881, | $244,037 94 | |
| Add: Premium on bonds sold that year, - | 107,257 25 | |
| Relaying track with steel rails, - | 133,779 09 | |
| Spurs and main line sidings, - | 45,430 00 | |
| Balance on Co. securities not cred., - | 2,357 50 | |
| | | 532,861 78 |
| Total applicable to dividends, - - - - | | $665,946 47 |
| Less 7 per cent. dividend on $6,500,000 of preferred stock, | | 455,000 00 |
| Surplus carried to January 1, 1882, - - - | | $210,946 47 |

1882.

| | | |
|---|---:|---:|
| Surplus for 1881 brought over to 1882, - - - | | $210,946 47 |
| Net earnings reported for 1882, - - - | $438,989 89 | |
| Add: Premium on bonds sold 1882, - | 34,702 50 | |
| Relaying track with steel rails, - | 31,224 56 | |
| Spurs and sidings made out of earnings, | 9,640 00 | |
| Bal. of dividend on Co. stock, - | 647 00 | |
| | | 515,203 95 |
| Total applicable to dividends in 1882, - - | | $726,150 42 |
| Less 7 per cent. dividend on $6,500,000 preferred stock, - | | 455,000 00 |
| Surplus carried to 1883, - - - - - | | $271,150 42 |

### 1883.

| | | | |
|---|---:|---:|---:|
| Surplus from 1882, | | | $271,150 42 |
| Net earnings reported for 1883, | $488,799 13 | | |
| Add: Premium on bonds sold in 1883, | 12,136 50 | | |
| Relaying track with steel rails, | 65,000 00 | | |
| Spurs and sidings made out of earnings, | 16,960 00 | | |
| Enlargement of steamers, | 40,286 44 | | |
| | | | 623,182 07 |
| Total applicable to dividends in 1883, | | | $894,332 49 |
| Less dividend of 7 per cent. on $6,500,000, | | | 455,000 00 |
| Surplus carried to January, 1884, | | | $439,332 49 |

### 1884.

| | | | |
|---|---:|---:|---:|
| Surplus from 1883, | | | $439,332 49 |
| Net earnings reported for 1884, | $400,303 40 | | |
| Add: Premium on bonds sold 1884 | 9,945 00 | | |
| Relaying track with steel rails, | 10,000 00 | | |
| Spurs and sidings made with earnings, | 11,460 00 | | |
| Equipment renewals, | 15,000 00 | | |
| Depreciation on steamers, charged to expenses, | 6,000 00 | | |
| | | | 452,708 40 |
| Total applicable to dividends in 1884, | | | $892,040 89 |
| Less 7 per cent. dividends on $6,500,000, | | | 455,000 00 |
| Surplus carried to January 1, 1885, | | | $437,040 89 |

### 1885.

| | | | |
|---|---:|---:|---:|
| Surplus from 1884, | | | $437,040 89 |
| Net earnings reported for 1885, | $272,451 77 | | |
| Add: Relaying track with steel rails, | 9,996 35 | | |
| Spurs and sidings made with earnings, | 5,400 00 | | |
| Equipment and renewals charged to expenses, | 36,000 00 | | |
| Depreciation of steamers and dining-hall, | 8,500 00 | | |
| Dividend on Co. securities, | 4,740 00 | | |
| | | | 337,088 12 |
| Total applicable to dividends in 1885 | | | $774,129 01 |
| Less 7 per cent. dividend on $6,500,000, | | | 455,000 00 |
| Surplus January 1, 1886, | | | $319,129 01 |

If, as the experts testify, the expenses of work trains engaged in construction, and freight on material used for construction, should be charged to construction account, and corrections were made in that respect, the annual balance, after deducting the 7 per cent. dividend, would be still larger than as above given. It thus appears that, independently of the surplus land funds, the earnings or net income of the road, if the accounts between construction and operating expenses had been properly kept, in conformity with the provisions of the charter, and according to the rights of the two classes of stockholders, as therein defined, were amply sufficient, after paying interest on the company's

entire bonded debt, repairs, and expenses of equipment and renewals, to pay the annual dividends of 7 per cent. on $6,500,000 of preferred stock for the five years in question. But, when the large surplus land fund is taken into consideration. it is difficult to see any reason for not declaring and paying that dividend for five consecutive years, except a deliberate purpose to keep the provisional certificates holders out of any voice or vote in management of the company, or to indefinitely postpone their admission. The 5 per cent. deficiency in dividends for the five consecutive years under consideration on the $6,500,000 of preferred stock actually issued amounts to $317,100. This could have been readily withdrawn from the surplus land funds if earnings had been inadvertently diverted to construction, and the management had desired to replace the amount, so as to make it applicable to dividends; or, if improper charges to earnings had not been made from year to year, as already shown, the deficiency would not have existed. While the earnings have been thus misapplied or diverted, the policy of the management has been steadily in the line of permanent improvements, and large enhancement in the value of the company's property. Its equipment has been greatly enlarged, its main tracks, sidings, spurs, and branches have been extended, and its general efficiency not merely maintained, but largely increased. When the company took possession in October, 1880, the road-bed and equipment were valued at $9,671,958.90. On the 31st December, 1880, that valuation had increased to $10,311,193.38. At the close of 1881 the valuation of road-bed and equipment had increased, as reported by the general manager, to $12,281,853.02. At the close of 1882 it had grown to $12,966,601.64. At the close of 1883 it was reported at $13,-506,231.94. At the close of 1884, after deducting $1,116,070.45, charged off to depreciation, the valuation stood at $12,657,430.55, and on December 31, 1885, it was placed at $12,512,928.81. If the arbitrary deduction had not been made in 1884, the valuation at the close of 1885 would have stood at $13,628,999.26, making an increase since October 1, 1880, of $3,957,040.36; an amount exceeding the provisional certificates now seeking admission as unpreferred stock in the company. These valuations are independent of the large surplus lands and land funds. Look at the condition of the company from another stand-point. Its total funded debt is $5,299,000, while the preferred stock actually issued is $6,342,000, making its total capitalization $11,641,000. It has 361.64 miles of main line, and 115.72 miles of business producing tracks in addition; making 477.38 miles of roadway, on which there is of capital and funded debt only $11,641,000, or less than $25,000 per mile. The capitalization and funded debt of other railroads in the state of Michigan, it is said, will average about $45,000 to the mile. Under these circumstances, neither the company nor the preferred stockholders who control its management, which has been conducted more with a view to the permanency and security of their own interests than with regard to the rights and interests of the common or unpreferred stockholders, can rightfully longer exclude the latter from their charter share in the corporate enterprise. This suit is practically a contest between

the two classes of stockholders. The preference class is in control, and is interested in keeping the other out. This result has been so far effected by expending the company's earnings and income in permanently improving the property, or for other purposes than those contemplated by article 4 of the charter, whereby net income applicable to dividends has been reduced, while the valuation of the company's road-bed and equipment has steadily increased. The preferred class, in control, select the management. This management, or directory, are more than mere agents of the company. They occupy a fiduciary relation towards the unpreferred class of shareholders, in respect to the rights conferred upon them in and by the company's charter. They neglect or deliberately disregard the duties and obligations growing out of such trust relation, and then attempt to shield themselves, or defend their conduct on the ground that they were only discharging the company's duty to the public. The facts of the case do not sanction this defense.

The court, having been compelled carefully to examine the evidence, which is quite voluminous, and analyze the company's accounts, so as to determine the rights of the parties, and being fully satisfied from this investigation of the accounts that the aforegoing statement in respect to the yearly income applicable to dividends is substantially correct, it is not deemed necessary to refer these matters to a special master for a report, and thereby further delay the final disposition of the case. The conclusions of the court on this branch of the case are that complainants are entitled to the relief sought; that they are entitled to be admitted into the defendant company as regular stockholders of the common or unpreferred class; that this right accrued to them and to others similarly situated on January 1, 1886; that a sufficiency of surplus land funds is in the hands of the land trustees, and subject to the control of the company to pay, or make good, the deficiency of $1\frac{1}{2}$ per cent., or $95,110, on dividends for 1881; $\frac{1}{2}$ per cent., or $31,710, on dividends for 1882; and 3 per cent., or $190,260, on dividends for 1885, upon the preferred capital stock actually issued, amounting to $6,342,000; and the defendant company should be required to pay over to the preferred stockholders, *pro rata*, out of said surplus land funds or other funds at its disposal, said annual deficiencies, so as to make up to said preferred stockholders their full 7 per cent. dividends for five consecutive years, and thus comply with the conditions, as the company and its management should have done, on which the provisional certificate holders were entitled to be admitted; and, further, that the defendant company, its officers and agents, should be enjoined from depriving complainants, or those in like state with them, of their rights as common stockholders, in voting or otherwise, and from applying the income and earnings of the company, without the consent of said common stockholders, to improvements of a permanent character; all of which is accordingly ordered and decreed, with the further direction that the defendant corporation, its officers and directors, be ordered to issue regular certificates for common or unpreferred stock in the company to complainants and other holders of provisional certificates, severally, according to their respective holdings of

the latter certificates, and upon the production and surrender of the same.

In the case of *Parker et al.* v. *Flint & Pere Marquette Railroad Company and the Port Huron & Northwestern Railway Company et al.* the same provisional certificate holders as in the other suit seek on behalf of themselves and others with like interests to restrain the Flint & Pere Marquette Company from purchasing the stock and franchises of the Port Huron & Northwestern Railway Company, alleging that such purchase is not authorized by law; that it would be *ultra vires;* that it would involve a very large expenditure of money, inasmuch as the Port Huron & Northwestern Railway Company is a narrow-gauge road, in bad condition, and would require heavy outlays to render it of any practical benefit to the purchasers, and that such outlays and expenditure would be drawn from earnings and income of the Flint & Pere Marquette Railroad Company, which, under article 4 of its charter, should be applied to dividends; and, generally, that the purchase would deplete the revenues of the latter road, seriously affect their rights, and that they should, if it is legal, have a voice and vote on the question of such purchase. The Port Huron & Northwestern Railway Company filed an answer, saying, in substance, that negotiations were pending for the purchase or acquisition of its road by the Flint & Pere Marquette Company; that the method of effecting that would be such as would be legal under the laws of Michigan, without explaining what method was proposed. The Flint & Pere Marquette Company demurred, and thereby admitted the allegations of the bill. On the argument questions were raised as to the character of this suit, which sought, in addition to restraining said purchase, the same general relief sought in and by the first case. The court is of the opinion that the Port Huron & Northwestern Railway Company was neither a necessary or proper party to the litigation or questions involved in either of these suits; that this last bill was properly a supplemental bill. It was filed without leave, as required by equity rule 57; but it was filed November 28, 1887, for the purpose of enjoining a transaction which was about to occur, as alleged, on November 30, 1887, so that the provisions of rule 57 could not be conformed to. This bill will be dismissed as to the Port Huron & Northwestern Railway Company, with costs. The court will now order it to stand, and to be treated as a supplemental bill in the original suit, as may be done under the authorities. Story, Eq. Pl. §§ 882–905; *Neale* v. *Neales,* 9 Wall. 1; and *Graffam* v. *Burgess,* 117 U. S. 195, 6 Sup. Ct. Rep. 686.

The Flint & Pere Marquette Railroad Company admits the allegations of this supplemental bill by its demurrer, and thus presents the legal question whether, under the laws of Michigan, it can purchase the stock and franchises of the Port Huron & Northwestern Railway Company; and, if so, can it, as against the common or unpreferred stockholders, apply its income, either in paying for the interests purchased, or in improving and altering the property so acquired? It is now well settled that the proposed purchase of the stock, property, and franchises of the Port Huron & Northwestern Railway Company, as alleged in the supple-

mental bill, whereby the latter company would be absorbed by the purchasing company, cannot be legally made in the absence of lawful authority from the state of Michigan. *Pearce* v. *Railroad Co.*, 21 How. 442; *Thomas* v. *Railroad Co.*, 101 U. S. 71; *Branch* v. *Jesup*, 106 U. S. 478, 1 Sup. Ct. Rep. 495; *Railroad Co.* v. *Railroad*, 118 U. S. 290, 6 Sup. Ct. Rep. 1094. Do the laws of Michigan authorize or sanction such purchase? Under the general railroad law of the state (act 1873, § 29) railroad companies are allowed to consolidate upon certain terms, when they form continuous or connecting lines. This contemplates the formation of a new. corporation; and the assent of the stockholders in each company, or a majority thereof, is requisite to the consolidation. This statute is not applicable here. The bill charges, not a purpose to consolidate with the Port Huron & Northwestern Railway Company, but to purchase the latter's stock, property, and franchises, and to use the same as part and parcel of the purchasing company, and thus to bring the acquisition within the operation of its own charter. The consolidation statute does not authorize one company thus to acquire and absorb another. By section 28 of the general railroad laws of 1873 (1 How. St. § 3342) it is provided that one railroad corporation may subscribe to the capital stock of any other company organized under said act, with the consent of the latter; and by the acts of 1869 (1 How. St. § 3413) and 1873 (1 How. St. § 3403) one railroad company is authorized to aid another having an unfinished road, and to make running arrangements; and, where their lines are connected, may enter into arrangements for their common benefit, "consistent with and calculated to promote the objects for which they were [respectively] created." It is manifest, without discussion, that these statutory provisions do not authorize one railway corporation to acquire the stock and franchises of another completed company, with the intention of exercising the franchises of the latter, which is the case presented by the supplemental bill. Again, the complainants, being now entitled to admission into the Flint & Pere Marquette Railroad Company, as common stockholders, under and according to the provisions of its charter, and it being alleged and admitted by the demurrer that their interests and rights will be injuriously affected by the proposed purchase and acquisition of the Port Huron & Northwestern Railway Company, they have the right to invoke the interposition of this court in preventing the consummation of the transaction until they have an opportunity of expressing their assent or dissent thereto; for, if the transaction can be lawfully made in any way, it would still be an enlargement and extension of the corporate purposes and objects of the company, as defined in its charter, as to which they have the right to express their assent or dissent. The proper time to do this is before, and not after, the transaction is completed. *Black* v. *Canal Co.*, 24 N. J. Eq. 455.

In the opinion of the court the preliminary injunction should be granted on the case made out by the supplemental bill, admitted by the demurrer, and disclosed in the course heretofore pursued by the company's management towards the common stockholders. The demurrer of de-

fendants is overruled, and the injunction is accordingly ordered, with leave at any time hereafter, when the common stockholders shall have been admitted into their rights as ordered and decreed in the main case, to move for a modification or dissolution of the same. The supplemental bill will be dismissed as to the Port Huron & Northwestern Railway Company, with costs to be taxed against complainants. The remaining costs in both cases will be taxed against the Flint & Pere Marquette Railroad Company.