## SAGE *v.* CENTRAL RAILROAD COMPANY.

1. In the mortgage of a railroad it was covenanted and agreed by all the parties thereto, that, in case of a foreclosure sale of the mortgaged property under a decree, the trustee named in the mortgage should, on the written request of the holders of a majority of the then outstanding bonds thereby secured, purchase the property at such sale for the use and benefit of the holders of such bonds, and that the right and title thereto should vest in him, no holder to have any claim to the proceeds except his *pro rata* share thereof, as represented in a new company or corporation, to be formed for their use and benefit; and that the trustee might take such lawful measures to organize a new company for their benefit, upon such terms, conditions, and limitations as the holders of a majority of the bonds should in writing request or direct, and he should thereupon reconvey the premises so purchased to such new company. On default of payment a suit was brought by the trustee against the mortgagor and subsequent mortgagees, praying for a foreclosure of the first mortgage, and for general relief. *Held,* 1. That such an agreement inures equally to the benefit of such bondholders, and that each holds his interest subject to the controlling power given to the majority of them. 2. That the trustee, the *cestui que trust,* and the trust itself being before the court, and it appearing that the holders of a majority of the bonds had in writing requested and directed the trustee, if he became the purchaser of the prop-

erty, to convey it to a new corporation, the court might authorize and direct him to bid at the sale at least the amount of the principal and interest of the first-mortgage bonds, and might provide for a complete execution of the trust. 3. That though the specific relief sought was a strict foreclosure, a decree for a sale of the property and for the enforcement of the agreement contained in the deed was, under the prayer for general relief, appropriate. 4. That it was not error for the court to require that if a person other than the trustee became the purchaser at the sale he should pay at once, in cash, a part of his bid as earnest money. 5. That where some of the first-mortgage bondholders were permitted to intervene as parties to prosecute, for the protection of their several interests, an appeal from the decree for a sale of the property, and the appeal not having been made a *supersedeas*, the decree was executed, they cannot object to orders made prior to the decree, nor assign for error any part of it which is not injurious to their interests.

2. Where the decree required notice of the sale of the property to be advertised in certain newspapers, among which was A., printed in a certain city, and it appearing that, before such advertisement was made, A. had been merged into B., or that its name had been changed to B., — *Held*, that the identity of the paper remaining, the advertisement in B. was a substantial compliance with the order.

APPEAL from the Circuit Court of the United States for the District of Iowa.

The facts are stated in the opinion of the court.

*Mr. Matt. H. Carpenter* and *Mr. N. A. Cowdrey* for the appellants.

*Mr. Herbert B. Turner*, *Mr. C. C. Cole*, and *Mr. R. L. Ashhurst*, contra.

MR. JUSTICE STRONG delivered the opinion of the court.

This proceeding was commenced by a bill filed at the suit of Charles Alexander and others, holders of bonds secured by a first mortgage or deed of trust of the Central Railroad Company of Iowa, praying for an account, for the appointment of a receiver, and for a foreclosure of the mortgage. The bill was filed to October Term, 1874, in the Circuit Court. It made the railroad company, and the Farmers' Loan and Trust Company of New York, who were the trustees named in the mortgage, parties defendant. Subsequently, at the same term, the trustees, who were also trustees under second and third mortgages, filed their original bill, as well for the benefit of the complainants in the first bill as for all other bondholders, praying also for an account, for a receiver, and for a foreclosure.

By order of the court, these two bills were consolidated, and the hearing of the case proceeded until the 22d of October, 1875, when a final decree was made, directing, *inter alia*, a sale of the mortgaged premises. On the 15th of January, 1876, Russell Sage, James Buell, and N. A. Cowdrey, on their petition, representing themselves to be holders of some of the mortgaged bonds secured by the first mortgage, were permitted to intervene as parties, to prosecute an appeal to this court, for the protection of their several interests, against the decree of Oct. 22, 1875. They have accordingly appealed; and as their appeal was not made a *supersedeas*, and the decree was executed by a sale, they have entered a second appeal from the confirmation of that sale.

Directing our attention first to the appeal from the decree of Oct. 22, 1875, it is observable that it raises no question respecting the validity or amount of the debts due by the mortgagors and secured by the several mortgages, nor any respecting the order in which they are entitled to payment. There is some complaint that the court, before the final decree was entered, directed certain payments to be made by the receiver for locomotives and rent of cars used upon the road, either by the receiver or before his appointment. Whether these orders were correct or not, we will consider hereafter. The appellants do not complain that the decree of the court has not determined correctly the amounts due upon the several mortgages, and marshalled them in their proper order of priority. Nor do they insist that it was not proper for the court, in view of the facts as they appeared, to order a sale of the mortgaged property. Their complaint is rather respecting the disposition which the court decreed to be made of the property, in case the trustees of the mortgage should become the purchasers. To understand those dispositions, and the reasons why they were ordered, it is necessary to observe carefully the provisions of the deed upon which the bill was founded, and which, therefore, properly affected the decree. Some of them are quite peculiar. The first mortgage was given to the Farmers' Loan and Trust Company of New York, to secure the payment of bonds of the railroad company to the amount of $3,776,000, with interest thereon. It covered the entire corporate property of the mort-

gagor, constructed or to be constructed, and all its franchises and privileges, — all its property that might thereafter be acquired, including machinery, locomotives, rolling-stock, tools, and supplies, as well as the net income of the mortgagor. It contained also the usual stipulation made in railroad mortgages, that in case of default in the payment of interest the principal should fall due; that the trustee, on the written request of a majority of the holders of the bonds, should be authorized and empowered to take possession of the property, and sell it at public auction. It is unnecessary to refer to the other provisions, except the following, which are special and unusual, and have a material bearing upon the decree of which the appellants complain. These we quote at large : —

" And it is further covenanted and agreed by and between the parties hereto, that in case of any judicial foreclosure sale, or other sale of the premises embraced in this mortgage, under the decree of any court having jurisdiction thereof, based upon the foreclosure of this mortgage, and the holders of a majority of the then outstanding bonds secured by this mortgage shall in writing request the said trustee or their successor, they are authorized to purchase the premises embraced herein for the use and benefit of the holders of the then outstanding bonds secured by this mortgage. And having so purchased said premises, the right and title thereto shall vest in said trustees, and no bondholder shall have any claim to the premises or the proceeds thereof, except for his *pro rata* share of the proceeds of said purchased premises, as represented in a new company or corporation to be formed for the use and benefit of the holders of the bonds secured hereby, and the said trustee may take such lawful measures as deemed for the interest of said bondholders, to organize a new company or corporation for the benefit of the holders of the bonds secured by this mortgage. Said new company or corporation shall be organized upon such terms, conditions, and limitations, and in such a manner, as the holders of a majority of said outstanding bonds secured by this mortgage shall, in writing, request or direct, and said trustee so purchasing shall thereupon reconvey the premises so purchased by them to said new company or corporation."

It was a mortgage containing these stipulations that the Circuit Court was called upon to enforce. And the several

bondholders claiming under the mortgage held their interests subject to this controlling power given to the majority of all the holders.

There were two subsequent mortgages of the same property, given by the railroad company to the same trustee, to secure the payment of other bonds.   These were set forth in the bill; and when the consolidated case was ripe for a decree, it appeared that there was due from the company for principal and interest of the first-mortgage debt the sum of $4,623,334.99 in gold, with interest from Oct. 15, 1875; upon the second mortgage, $1,136,246.86; and that there were $420,000 of bonds, secured by the third mortgage, outstanding.   The court therefore decreed that the mortgagors should pay within ten days the sum due to the bondholders under the first mortgage; and if they failed to pay, that the mortgagees under the second and third mortgages and the judgment creditors, or any of them, in the order of their respective liens, should pay the same; and that in default of said payment by any of said parties, their equity of redemption in the premises should be foreclosed.

Had this been all, the result would have been a strict foreclosure.   The master to whom the case had been referred had found and reported that the property would not sell at the date of his report (Oct. 11, 1875) for more than forty cents on the dollar of its indebtedness, and this report had been confirmed. It was therefore manifest that neither the railroad company nor any of the lien creditors subsequent to those holding under the first mortgage could or would pay the $4,620,334.99 thereby secured.   But a strict foreclosure was undesirable for all the parties.   Not only would it have cut off entirely the bondholders secured by the second and third mortgages, whose interests were before the court, and which it was bound to protect as far as possible, but it would have made the large number of bondholders under the first mortgage practically tenants in common of the railroad property.   The inconveniences of such a result are obvious enough.   A sale, therefore, was for the interest of all, and to that no one objected.   Indeed, it was contemplated as possible in each of the three mortgages.   The bondholders, through their trustee, had made arrangements in view of such a contingency.   They had agreed what should be the effect and

consequence of a judicial sale. All of them had taken their bonds with knowledge of the agreement and subject to it. What that agreement was, what purpose it was intended to subserve, against what mischief it was proposed to guard, and by what mode it was stipulated the object intended should be accomplished, it is very important to consider. By the agreement, the entire body of the bondholders consented to place their interests, to a certain extent, under the control of a majority of their number. Their trustee was authorized to purchase the property at the judicial sale, should one be ordered, and convey it to a new corporation, to be formed for their benefit, provided a majority of them should, in writing, request such a purchase. They had agreed to more than this. They had consented that the new corporation should be organized upon such terms, conditions, and limitations, and in such manner, as the holders of a majority of the outstanding bonds secured by the mortgage should, in writing, request or direct. This consent and agreement, this deposit of power in the majority, was contained in the mortgage under which the appellants claim.

The purposes sought to be accomplished by it are manifest.

*First*, It was designed for protection against the perils of a forced sale of an unsalable property for cash. It was well known that at judicial sales of railroads for cash there is little likelihood of obtaining a bid for a sum at all commensurate with the value of the property sold, or with the amount of incumbrances upon it. The amount required is so large usually, that it is beyond the reach of ordinary purchasers. In such a case as the present, the first-mortgage bondholders are the only party that can become the purchasers, and they only, because they need not pay their bid in cash.

*Secondly*, The agreement looked farther. It provided for the contingency of a purchase by bondholders under the mortgage. But such a purchase could not inure equally to the benefit of all, unless all were parties to it. There is almost a certainty that in foreclosure sales of a railroad, especially when the mortgage debts exceed the market value of the property, as in this case, the purchaser will be an association of some of the bondholders secured by the mortgage, who buy with the intention of organizing a new company to hold the property for their

interests.   Where the bondholders are numerous, diversities of views respecting the new organization may be expected, and they generally arise.   Very rarely do all the bondholders unite in making the purchase.   Frequently there is more than .one combination, and a strife between them to secure the advantage hoped for from the purchase and consequent control of the property.   The result is that those who do not belong to the successful combination are excluded from those advantages, and are not placed upon an equal footing with the others.

*Thirdly*, Another evil, that observation shows to be very frequent, is that the arrangements for purchasing the mortgaged property and organizing a new company, desired by the majority of the bondholders, and which would be for the equal benefit of all, are resisted by a small minority, unless they, the minority, are paid in full, .or superior advantages are conceded to them, at the expense of their fellows.

It was .in view of all this that the first-mortgage bondholders entered into the agreements contained in the mortgage, — the agreements which we have quoted.   They provided that there should be no judicial sale for cash, unless the. amount bidden at the sale should equal the sum due and secured by the mortgage. Instead of such a sale they provided a method by which all the bondholders with equal rights might effect a reorganization of the indebted corporation, and become the owners of the franchises and. property mortgaged.   This mode was the creation of a new corporation in which the property should be vested, for the equal·benefit of all the holders of·the bonds, thus preventing any minority or any bondholders from demanding that their wishes and interests should be given a preference to those of others in like condition, or that they should be paid in whole, or in part, in cash.   So the agreement was in part intended to guard against the evils resulting from the want of unanimity among those whose rights were exactly the same, and the possible necessity of raising money .to pay off non-assenting holders of the bonds.   It was to secure the common interests of all the bondholders, in such a manner that none should obtain an advantage over the others, that it was agreed the purchase might be made by the trustee on account of all, and that the subsequent disposition of the subject of the pur-

chase should be for the common benefit of all.  To carry out these intentions a majority of the bondholders was empowered to act controllingly for the entire body, in matters respecting the purchase and disposition of the property purchased, subject to the limitation that the purchase, if made by the trustee, should be for the use and benefit of the outstanding bonds; that the property should be conveyed to a new company which should be organized for their benefit, on such terms, conditions, and limitations as the holders of a majority of the outstanding bonds should request or direct.  The agreement, though unusual, was a reasonable one.  While it prevented a small minority of the bondholders from forcing unreasonable and inequitable concessions from the majority, it did not empower that majority to crush out the rights of the minority, or subject them to any disadvantage.  It authorized only such arrangements as would inure equally to the benefit alike of the majority and the minority.

Such was the contract and such the power conferred upon a majority of the bondholders.  It was such a contract which the bills brought before the Circuit Court for a decree.  In view of its provisions we cannot think it was error to decree, as the court did, that the mortgaged property should be sold to the highest and best bidder, and that the trustee should be authorized and directed to bid at the sale, as trustee for the first-mortgage bondholders, at least the amount of principal and interest of the first-mortgage bonds.

The decree went farther.  At the time when it was made it appeared that a large majority of the first-mortgage bondholders had, in writing, requested and directed the trustee, if becoming the purchaser, to convey the property to a new corporation, organized substantially on the terms, conditions, and limitations prescribed in the decree which the court made.  The request was an attempted exercise of the power conferred upon that majority by the mortgage.  The trustee, the *cestui que trust*, and the trust itself were before the court, and the court undertook a complete execution of the trust.  It decreed as follows : —

"That if said trustee, as aforesaid, shall become the purchaser of said property at such sale, the title shall pass abso-

lutely to said trustee, subject, however, to the trusts herein indicated on behalf of the several parties in interest, being the first, second, and third mortgage bondholders, creditors and stockholders of the Central Railroad Company of Iowa; and said property shall be conveyed by said trustee to a corporation organized, or to be organized, for the purpose of acquiring said property, under the provisions of said first mortgage, and of this decree, and to be approved by a majority of said first-mortgage bondholders, in which said corporation the controlling interest and power of management shall be given to the first-mortgage bondholders in such manner as the majority of such first-mortgage bondholders shall indicate and provide, and in which the second-mortgage bondholders shall receive a second class of stock for the full amount, principal and interest, of said second-mortgage bonds; and in which corporation the third-mortgage bondholders and general creditors shall receive common stock at par for the respective amounts due them; and in which the stockholders of the defendant shall receive common stock at the rate of one dollar in the new corporation for every three dollars of stock held by them in the defendant corporation."

Against this part of the decree the appellants present several objections. They urge that it was unauthorized by the prayer in the bill of complaint, and was not responsive thereto. It is true the bill contained no specific prayer for such directions; but beyond the relief specifically asked the complainants prayed for such other and further relief as the nature of the case should require, and as might seem meet to the court. The specific relief sought was a strict foreclosure; but under the prayer for general relief it is not questioned that the decree for a sale was appropriate. And as the deed of trust was made a part of the bill, and provided what should be done in case the trustee became the purchaser at the sale, it does not appear to be going outside of the case to enforce the agreement contained in the deed, into which the railroad company, the trustee, and, through the trustee, all the bondholders had entered.

A second objection is that in this part of the decree the court attempted to force inconsistent duties and trusts upon the trustee, different from those the parties had established by

contract under seal, viz. by the mortgage deed.   The mean-
ing of this is, as we understand it, that the decree directs a
disposition of the property variant from the one stipulated for
in the deed of trust.   At first sight this objection seems to be
not without merit.   But after a careful examination of the deed,
bearing in mind also the purposes sought to be accomplished by
it, the mode prescribed for the accomplishment of those purposes,
the powers vested in the majority of the bondholders, and the
subordination of the trustee to those powers, we are unable
to say that the decree was unwarranted.   We cannot say that
the majority transgressed the power they possessed, in their
arrangement for the organization of the new company, and,
consequently, that the decree of the court carrying out that
arrangement directed a disposition of the property different
from that to which all the bondholders had assented.   The
primary object of the deed was to secure to the bondholders a
prior right to the entire property, — the subject of the trust, —
so far as it was needed for the full payment of the bonds.
The decree preserves this right in all its entirety.   It directs
that in the new corporation to which the trustee is ordered
to convey, the controlling interest and power of management
shall be given to the first-mortgage bondholders in such man-
ner as the majority of them shall indicate and provide.   It
subordinates to their rights all the interests of the second and
third mortgagees, as well as those of the general creditors and
the stockholders of the railroad company, foreclosing entirely
the equity of that company.

The agreement in the deed of trust (a similar one being also
in the second and third mortgages) contemplated a substantial
reorganization.   It was for this that the power was given to
the majority of the bondholders.   The power was coupled with
a large discretion.   The majority was authorized to define the
" terms, conditions, and limitations " under which the new
company should be organized.   What those should be was
thus left to the discretion of the donees of the power.   " Terms,
conditions, and limitations " are broad words.   Let it be con-
ceded that the new organization must be for the benefit of the
holders of the first-mortgage bonds, how can we say it is not
for the benefit of those holders that entirely subordinate inter-

ests are conceded to junior lien creditors and to the stockholders of the former corporation? How can we say that such a concession was beyond the discretion with which the agents of the bondholders, that is to say, the majority, were clothed? Such concessions are generally made in reorganizations of railroad companies, and they are regarded as beneficial to the joint lienholders. They prevent delay and expenditure arising out of litigation between creditors, which are sometimes almost ruinous, and they lessen the risk of redemptions. The majority were empowered to direct the terms and conditions under which the new corporation should exist, and hold the property conveyed to it, as well as the limitations within which it might act. It is not intended that the majority could postpone the rights of any minority of the bondholders to those of other creditors, or allow any interference with those rights. Nothing of the kind has been done. Under the agreement the appellants, as well as the other bondholders, had, in case of a purchase by the trustee, no claim to the property purchased or to the proceeds thereof, " except for their *pro rata* share of the proceeds as represented in a new company," to be formed in the manner, and upon such terms and conditions, and with such limitations, as a majority of their associates may direct.

Upon the whole, therefore, we think the decree of the court, in the particular we are now considering, is consistent with the agreement of the bondholders contained in the deed of trust, and, therefore, that this objection of the appellants should not be sustained.

We see no error in the decree, so far as it required any other person than the trustee under the first mortgage, if he became the purchaser at the sale, to pay at once in cash a part of his bid, as earnest money. Such other purchaser, of course, must be a cash purchaser, at least to the extent of the sum due on the first mortgage. It was, therefore, no hardship to require an immediate payment by him of a part of his bid, and the order that he should make such payment was a protection against false or unreal bids. That the same requirement was not made of the trustee was very proper, for the reason that a purchase by the trustee required no payment of money, beyond a sum sufficient for costs, unless the bid

exceeded the sum due on the first mortgage, the purchase being made for the first-mortgage bondholders.

The appellants further object to certain orders made by the court for payment by the receiver to John S. Newberry *et al.*, to Isaac M. Cate *et al.*, to Mowery Car Company, and to Haskell, Barker, & Co., for rolling-stock, furnished under lease or otherwise, for the railroad.   These orders were no part of the decree of Oct. 22, 1875.   These orders were made prior to that time, when the appellants were not parties to the suit, except through their trustee.   They did not intervene and become parties until after the decree of October 22 was made. Then they were permitted to become parties " so far as to prosecute, if they so elected, for the protection of their several interests therein, an appeal to the Supreme Court from the decree entered Oct. 22, 1875."   They asked for nothing more. They prayed for no appeal from any prior orders, and certainly they cannot be permitted now to object to orders made prior to that decree, — orders from which they have not appealed. But if this was not so, it would be sufficient to say that the orders were not erroneous.   They were within the rules we announced in *Fosdick* v. *Schall* (*supra*, p. 235), and it is sufficient to refer to that case for their justification.

The appellants further object that the eighth paragraph of the decree was erroneous.   That paragraph is as follows: —

" *Eighth*, That the right of the several parties to this suit claiming liens by judgment or otherwise upon the property of defendants, and of the several parties claiming rights or equities in and to said property, or any property in the use of said railroad company, or any part thereof, by virtue of contracts, or cases whereby material, labor, or property has been furnished for or placed upon said defendant's road, shall not be affected by this decree, the same being taken subject to the rights and equities of said parties as the same may be established and declared hereafter by this court."

This order relates to the effect of the decree, and not to the effect of a sale made under it, as the appellants seem to think. It reserves certain rights claimed for further adjudication.   It cannot well be understood without reference to the nature of the claims and their condition when the decree was made.

This appears in the report of the master, to which there was no exception in these particulars. The claims were judgments amounting in the aggregate to about $13,000, recovered against the railroad company for injuries to persons and property, and which were liens prior to the mortgages. From some of these appeals had been taken. There were also judgments inferior to the liens of the three mortgages, and other judgments not claimed to be liens at all, and there was a floating debt. It was impossible to determine definitely the extent of the rights of these various claimants, when the sale was ordered, and no one could have been injured by reserving them for subsequent adjudication. This objection, therefore, has no weight.

One other remains. The appellants assign for error that the decree is in one particular illegal, incongruous, and contradictory, in this: that while in the first paragraph the right of redemption is barred as to the railroad company, the defendant, the second and third mortgage bondholders, and the judgment creditors, it is given in the seventh paragraph to the second and third mortgage bondholders, the general creditors, and the stockholders of the defendant company, "thus apparently denying the right of redemption to the railroad company and to the judgment creditors." The assignment does not complain that a right of redemption was given to those to whom it was accorded. It rather complains that it was denied to the railroad company and to the judgment creditors. If such be the meaning of the decree, how can the appellants complain of it? To them it works no injury, and those who might complain have not appealed. Besides, if the other portions of the decree are correct, as we have endeavored to show, redemption by anybody is, to say the least, extremely improbable, if not impossible. We cannot avoid the conviction that this assignment of error is not the assertion of a real grievance.

The appellants are the holders of about six per cent of the first-mortgage bonds. They are endeavoring to overturn an arrangement agreed to by a large majority of the bondholders appointed by themselves to make an arrangement for the reorganization of the debtor company, — an arrangement sanctioned by the court, which does not lessen their security or postpone them to any other bondholders, but which preserves to its fullest

extent all the rights assured to them by the mortgage.    They ought not to succeed without the most substantial reasons.    We do not find such reasons in the record, and the decree of the Circuit Court is affirmed.

Of the second appeal, that taken from the decree of August 31, 1877, confirming the master's report of the sale, little need be said.    The errors assigned to it are substantially the same as those we have considered in the former case, and held to be insufficient to justify a reversal of the decree of Oct. 22, 1875. There are two or three other objections; only one of which, however, requires any notice.    The others are wholly without merit.

It is objected that the decree and order required notice of the sale to be advertised in a newspaper printed in the city of New York, called the "Financier," as well as in other newspapers; that the master did not advertise the sale in that newspaper, nor report his inability to find any such newspaper to this court, in which the former appeal was then pending, and therefore did not comply with the order of the court.    At the time when the sale was made there was no *supersedeas* in existence, and before the sale was advertised it was represented and made to appear to the circuit judge that the "Financier" had been merged into the "Public," or that its name had been changed to the "Public."    He therefore, on the 8th of January, 1877, ordered that the notice of sale be inserted in the "Public" with the same effect as if the name of the paper had not been changed, and he directed the order to be entered of record.    The sale was thus accordingly advertised.

Now, whether the judge had authority to make such an order in a recess of the court, it is not worth the while to inquire, for if he had not, advertisement in the "Public" was a substantial compliance with the original order.    If the name of "Financier" was merely changed, the identity of the newspaper remained, and the order was to advertise in that newspaper.    And so if the "Financier" was merged into the "Public," its subscribers and readers, to whom the advertisement was addressed and required to be addressed, were reached by it, as they would have been had there been no merger or change of name.    The purpose of the order to advertise in that newspaper was publicity, and to

reach those persons who saw the paper. That purpose was not defeated by a change of name or a union with another newspaper. This objection, therefore, is formal rather than substantial. The case requires nothing more.

*Decree affirmed.*

Mr. Justice Clifford, Mr. Justice Miller, and Mr. Justice Harlan dissented.