## EQUITABLE TRUST CO. v. UNITED STATES OIL & REFINING CO. et al. (MAY, Intervener).

District Court, D. Wyoming.　June 9, 1928.

No. 1757.

C. E. Herring, of Omaha, Neb., for plaintiff.

Charles Battelle, of Omaha, Neb., and E. E. Wakeman, of Newcastle, Wyo., for defendant Egaso Holding Corporation and intervener.

Werner, Harris & Buck, of Rochester, N. Y., for committee of majority bondholders.

KENNEDY, District Judge. The above-entitled cause is before the court upon a petition for confirmation of a sale under a proceeding having for its purpose the foreclosure of a trust deed securing bonds in the sum of $150,000. The confirmation is sought by the trustee under the trust deed, plaintiff in the suit, and a committee of the majority bondholders, and is opposed by one of the minority bondholders and by an unsuccessful bidder at the sale. The title owner also seeks a declaration of property rights as to certain property claimed by the trustee to pass under the deed of trust. A sale prior to the one here involved under the same trust deed was had, but by agreement of the parties, owing to uncertainty in the description of the premises to be sold, it was set aside and a new sale ordered. Such prior sale, however, is not in any way involved in this controversy.

The situation here is presented by the following circumstances: The plaintiff as trustee under the trust deed securing bonds in the sum of $150,000 which was in the nature of a first mortgage upon the premises involved, brought this suit at the request of the required number of bondholders to foreclose, and a decree of foreclosure was entered in due course. After the first sale had been set aside because of the uncertainties in description of the premises, counsel representing a bondholders' committee appeared in court with the counsel for plaintiff and join-

ed in a request for an order that the plaintiff as a trustee for all the bondholders be permitted to bid at the newly ordered sale for and in behalf of all said bondholders. Such order was made, but was ex parte so far as the minority bondholders were concerned, in that counsel for said committee of bondholders did not purport to actually represent all the bondholders, and does not in fact represent a considerable portion of said bonds. It was provided by said order that the trustee might become a bidder at said sale for the benefit of all the bondholders in an amount which should not exceed the sum found due under the decree, and that, in the event the trustee should become the purchaser of the property, it should deposit the sum of $20,000 as a guarantee of payment of the costs, expenses, allowances, accrued taxes, and liens upon the property, $5,000 of said $20,000 to be paid at the time the bid was made and accepted, and the balance of $15,000 at or before the confirmation of the sale. The record here discloses that the committee of bondholders seeking to have the trustee purchase represented $90,000 of the $150,000 of bonds outstanding. In order to avoid confusion as to the title to the property which was purported to be sold under the foreclosure, the amended and susbtituted decree of foreclosure provided that the property should be sold in eight parcels, so that it might subsequently be determined in respect to each parcel, whether or not such property was covered by the said trust deed; that instrument being somewhat uncertain as to description. As to parcels described as Nos. 1, 2, and 8, there would seem to be no controversy that these were included in the trust deed and should pass under it. As to parcels 3 to 7, inclusive, the question is raised as to whether or not they should be held to be included within the description of the trust deed, and, being bid upon and sold separately, the matter of their disposition will be considered later. The record further shows that one Albert E. May is the holder and owner of $33,500 par value of the $150,000 of bonds secured by the trust deed being foreclosed, but is not represented by the bondholders' committee. At the sale held on February 25, 1928, one Harry A. May made a bid for parcels 1, 2, and 8, admittedly covered by the trust deed and in the sum of $30,050, and the plaintiff, bidding by virtue of the order of the court as trustee for all the bondholders, thereupon bid the sum of $75,000, and the property was struck off as sold to said plaintiff as the highest bidder. The $5,000 provided by the order was deposited with the marshal, and it is assumed that, if the sale be confirmed, the remaining $15,000 would then be deposited by said committee of bondholders. The bid of Harry A. May of $30,050 made at the sale was a cash bid, while the bid of the plaintiff, as has been seen, was a bid on behalf of the bondholders represented by the debt secured by the trust deed being foreclosed, and a cash payment was or is to be in only such an amount as is reasonably estimated to cover the costs, expenses, and taxes due. Albert E. May, the holder of the $33,500 of bonds, now objects to the confirmation of the sale, and by appropriate motion presents his objection to the court that it be not confirmed, and asks alternatively that, if it should be accepted and confirmed, that the bidder or the bondholders' committee be required to pay the amount of the bid in cash, or that, if it be rejected, the cash bid of $30,050 be accepted, or that the sale be set aside and a new sale ordered. The trust deed itself lacks any provision by which under its terms the trustee is authorized to become a bidder at the sale on behalf of the bondholders, or that the minority of said bondholders might be bound by any bid on behalf of the majority for other than cash.

By this outline of the facts the question is fairly raised as to whether or not the court may authorize, lacking a provision in the trust deed, a trustee to become a bidder for all the bondholders at a sale of the property and to offer as a portion of said bid in consideration of the sale price the debt secured by the trust deed in lieu of cash. Briefs have been presented, and it seems that the research of counsel furnishes an economy of decisions upon the point involved. A decision of one state court, Nay Aug Lumber Co. v. Scranton Trust Co., 240 Pa. 500, 87 A. 843, Ann. Cas. 1915A, 235, seems to sustain the conclusion contended for by the bondholders' committee, to the effect that a trustee under the circumstances may be authorized to bid at such a sale, using the debt represented by the bonds in payment of the price bid, in which transaction the trustee then becomes the purchaser of the property, still holding it, however, for future dispositon as such representative of all the bondholders. In subsequent litigation, however, it appears that this plan worked out rather disastrously, as upon a subsequent sale of the property a loss was experienced inasmuch as the property did not bring within a third of the amount of a cash bid received upon the first sale. I am unable to bring myself into accord with the reasoning of the court in the case cited. As

it appears to me, the purchaser and holder of bonds had the right and reason to expect that, if there were a default in the payment of bonds under the trust deed, in case of foreclosure the property covered would be sold, and that he would receive his proportionate amount which the property realized in cash, and moreover I believe that this should be his right. If the proposed plan is adopted, he becomes unwillingly bound to cast his fortunes with the majority of the bondholders and to be subjected to the subsequent hazards of a greater loss than he would sustain by a sale in regular course for cash. In addition to this, we are confronted with the cumbersome and annoying circumstance of the court still necessarily retaining jurisdiction of the case for the purpose of authorizing and supervising future sales of the property by the trustee. A decision of the Supreme Court in the case of Sage v. Central Railroad Co., 99 U. S. 334, 25 L. Ed. 394, is one in which that high court sustains the legality of a trust deed which had a provision authorizing the purchase of the property by the trustee upon foreclosure for the benefit of bondholders, including the sale of the property by the trustee subsequently to a newly organized company by a majority of the bondholders. The language of this opinion, it would seem, rather justifies the conclusion that, if its legality is questionable where specifically authorized by the trust deed, it certainly ought not to be read into the instrument as a power incident to the trusteeship or one that the court could confer upon the trustees. At pages 340, 341, appears the following language:

"Thirdly, Another evil, that observation shows to be very frequent, is that the arrangements for purchasing the mortgaged property and organizing a new company, desired by the majority of the bondholders, and which would be for the equal benefit of all, are resisted by a small minority, unless they, the minority, are paid in full, or superior advantages are conceded to them, at the expense of their fellows.

"It was in view of all this that the first-mortgage bondholders entered into the agreements contained in the mortgage—the agreements which we have quoted. They provided that there should be no judicial sale for cash, unless the amount bidden at the sale should equal the sum due and secured by the mortgage. Instead of such a sale they provided a method by which all the bondholders with equal rights might effect a reorganization of the indebted corporation, and become the owners of the franchises and property mortgaged. This mode was the creation of a new corporation in which the property should be vested, for the equal benefit of all the holders of the bonds, thus preventing any minority or any bondholders from demanding that their wishes and interests should be given a preference to those of others in like condition, or that they should be paid in whole, or in part, in cash. So the agreement was in part intended to guard against the evils resulting from the want of unanimity among those whose rights were exactly the same, and the possible necessity of raising money to pay off nonassenting holders of the bonds. It was to secure the common interests of all the bondholders, in such a manner that none should obtain an advantage over the others, that it was agreed the purchase might be made by the trustee on account of all, and that the subsequent disposition of the subject of the purchase should be for the common benefit of all. To carry out these intentions a majority of the bondholders was empowered to act controllingly for the entire body, in matters respecting the purchase and disposition of the property purchased, subject to the limitation that the purchase, if made by the trustee, should be for the use and benefit of the outstanding bonds; * * * should be organized for their benefit, on such terms, conditions, and limitations as the holders of a majority of the outstanding bonds should request or direct. The agreement, though unusual, was a reasonable one. While it prevented a small minority of the bondholders from forcing unreasonable and inequitable concessions from the majority, it did not empower that majority to crush out the rights of the minority, or subject them to any disadvantage. It authorized only such arrangements as would inure equally to the benefit alike of the majority and the minority.

"Such was the contract and such the power conferred upon a majority of the bondholders. It was such a contract which the bills brought before the Circuit Court for a decree. In view of its provisions we cannot think it was error to decree, as the court did, that the mortgaged property should be sold to the highest and best bidder, and that the trustee should be authorized and directed to bid at the sale, as trustee for the first-mortgage bondholders, at least the amount of principal and interest of the first-mortgage bonds."

After what the court there says with reference to the difficulties which arise between minority and majority stockholders where

the minority insist upon the liquidation of their rights in cash, with no express power to bind them in the instrument under which their rights arise, it is difficult to conceive why the court would be discussing such a situation at length, if the challenged right might be justified under an implied power. The situation there discussed, but without the power and authority conferred in the instrument, is the case at bar. The order authorizing the trustee to bid at the sale for the benefit of all the bondholders in this case reserved the right to the court to decide any matters at issue that might be tendered on questions of confirmation.

By the foregoing I have reached the conclusion that the sale cannot be confirmed in the trustee in its present form, except upon what is equivalent to a cash bid by the trustee with money to be furnished by the majority bondholders constituting the bondholders' committee.

Reverting now to parcels 3, 4, 5, 6, and 7, which were sold separately under the decree of the court as purporting to be covered by the trust deed, a dispute has arisen between the trustee, the majority bondholders, and the prior purchaser of the property upon foreclosure of a junior mortgage covering both the disputed and undisputed property. The property is claimed by the trustee and the majority bondholders under a clause in the mortgage, which reads as follows: "Together with all and singular the tenements, hereditaments, and appurtenances belonging to the property hereby conveyed, or in any wise thereto appertaining, and the reversions, remainders, tolls, incomes, rents, issues, and profits thereof; and also all the estate, right, title, interest, property, possession, claim and demand whatsoever, as well in law as in equity, of the party of the first part, of, in and to the same, and any and every part thereof, with the appurtenances, *and also all and every other estate, right, title and interest, property and appurtenances which the said party, of the first part* may hereafter acquire."

This undoubtedly, like the foregoing question, is a close one and must be decided upon what reasonably might be considered to be the intent of the parties in regard to such property being included, as it comes within a class known to the law as "after-acquired property." In 41 C. J. 373, par. 156, the general rule is laid down in the following language: "The general rule at law is that a mortgage which purports to grant property to be acquired in futuro is void. Such a mortgage, however, apt words being used

to express the intent of the parties, is valid in equity as between the parties and will be regarded as attaching to the newly acquired property as it comes into the mortgagor's hands."

This is a proceeding in equity, and therefore the equitable rights of the parties should be taken into consideration. As applied to after-acquired property by railroad corporations, the Supreme Court, speaking through Mr. Justice Field in the case of Thompson v. Valley Railroad Co., 132 U. S. 68, at page 73, 10 S. Ct. 29, 31, 33 L. Ed. 256, says: "The validity of mortgages of that character by railroad companies upon property which may be subsequently acquired is not an open question now. It has been affirmed by adjudications of the highest courts of the states, as well as by this court. Indeed, in a majority of cases, mortgages by such companies upon their roads and appurtenances have been executed for the purpose of raising the necessary means to construct the roads; and sometimes, indeed, when the lines of such roads had only been surveyed."

The Third Circuit Court of Appeals in passing upon a similar question with relation to a shipbuilding corporation, although with a somewhat different clause purporting to cover "after-acquired" property, rendered its decision which is analyzed in the syllabus of Shooters Island S. Co. v. Standard Shipbuilding Corporation, 293 F. 706, in the following language: "A mortgage of after-acquired property is valid and enforceable in equity, but is subject to the qualification that it attaches only to the interest acquired by the mortgagor, and, if that interest is subject to prior liens, the mortgage is also subject to such liens."

I am unable to understand why a rule which would apply to railroad and shipping corporations should not as logically apply to a corporation organized for the purpose of producing and refining oil, such being the object of the defendant corporation. The specific description of the property in the trust deed is preceded by the phrase "refining site and tank farm described as follows." The description also specifies "including equipment and pumps." Parcels 3, 4, and 5, being after-acquired real estate in the vicinity of the refining plant proper, may reasonably be presumed to have been intended by the defendant corporation as additions for tank farm or other refining uses. Parcel No. 6 is a tank located upon the adjacent real estate not belonging to the defendant corporation, but placed there under agree-

ment with other parties. I am of the opinion that it would properly come within the terms of equipment, and, inasmuch as oil tanks are frequently moved about from one place to another, ought not to be held to have become part of the real estate upon which it is located. It should likewise be held to be included within the terms of the trust deed and covered by it as after-acquired property. Parcel No. 7 consists of various tools, engines, and paraphernalia usually employed in and about a refining plant, and in my opinion they are clearly pertinent to the property specifically covered by the trust deed, are part of the equipment, and, although they may have been after acquired, they are bound under it. In addition to the foregoing it may be said that those who have acquired the title to property under a subsequent trust deed had full notice and knowledge by virtue of the trust deed here in suit that the after-acquired property of the defendant corporation was covered and so made the purchase at their peril, and at least cannot complain that they were not advised of the claim which probably would be made, that it was included within and would pass under the senior trust deed.

At the sale of these parcels, upon parcel 3 Harry A. May bid the sum of $200 and the Equitable Trust Company the sum of $500; upon parcel No. 4 Harry A. May bid the sum of $2,000 and the trust company the sum of $5,000; upon parcel No. 5 May bid the sum of $500, and the trust company the sum of $3,000; upon parcel No. 6 May bid the sum of $1,000, and the trust company the sum of $1,500; and upon parcel No. 7 May bid the sum of $1,180 and the trust company the sum of $1,200.

This property having been considered by the court to have been covered by the trust deed under the after-acquired property clause, any bids for it should be considered as cash bids the same as for parcels 1, 2, and 8. The total bids for parcels 3, 4, 5, 6, and 7 made by the trustee for the benefit of the majority bondholders amount to $11,200, which, added to the bid made by the trustee for parcels 1, 2, and 8 of $75,000, make a total bid by the plaintiff for the entire property of $86,200. The combined cash bids of Harry A. May for parcels 3, 4, 5, 6, and 7 amount to $4,880, which, together with the $30,050 cash bid made for parcels 1, 2, and 8, make a total of $34,930.

Inasmuch as the amount to be deposited under the terms of a cash bid would partially revert to the bondholders represented by the bondholders' committee, it would be an idle thing to require them to deposit money which would subsequently be returned to them through the administration of the court of the proceeds, and which in addition might work a hardship upon them. This may partially be avoided by allowing the committee of bondholders representing $90,000 of the outstanding bonds to deposit a sufficient amount to pay the minority bondholders their proportionate amount of the net proceeds of the sale. The total bid by the trustee for these bondholders being $86,200, and reserving therefrom $20,000 for expenses, costs, and taxes, leaves a balance of $66,200. This apportioned pro rata among the total bondholders of $150,000 would produce a dividend of 44$\frac{2}{15}$ per cent. There being $60,000 of bonds held by the minority bondholders, the amount to be paid them would be $26,480. Adding to this latter amount the sum of $20,000 for expenses, costs, and taxes, there would be an aggregate total of $46,480. This amount the majority bondholders and the trustee may deposit within 30 days from the date of this memorandum, and the sale will thereupon be confirmed in the trustee as such for said majority bondholders who will then have the power to control the trustee as to his future action in the premises. All of the minority bondholders, or those not represented by said committee, may therefore file their claims with the clerk of the court for their pro rata share of the bonds held by them, upon the basis indicated within six months from the date of this memorandum. All of said minority bondholders who do not so file claims for their proportionate amount within six months will be held to have cast their lot with the majority bondholders, and shall be recognized by them as equitable holders in the property in proportion to the bonds held by them, and the unexpended money in the hands of the clerk will thereupon be returned to said trustee for the benefit of the majority bondholders. In the event the plaintiff and said majority bondholders fail to make the required deposit within the time stated, then the said Harry A. May, he being the next highest bidder at said sale, may deposit the amount of his combined bids for said property, to wit, $34,930, and the sale will thereupon be confirmed in him. And in the event that the said Harry A. May fails to deposit the amount of his said combined bids within the time stated, the court will by appropriate order set aside the sale and direct a new sale made of the mortgaged premises.

The court considers that, in handling the

matter as herein indicated, the majority bondholders may acquire the property, if they have confidence in it, by paying the minority bondholders their proportionate share of the amount bid. On the other hand, if they do not so desire to hazard their fortunes upon the enterprise, they may alternatively receive their proportionate share of the cash bid in the event the sale should be confirmed in the next highest bidder. In the event both lack confidence, the only other alternative will be a new sale with the rights of the parties more clearly defined.

An order and decree may be formulated in accordance with the views herein expressed, reserving to the parties and each of them their proper exceptions in the premises.