**GILLMOR et al. v. INDIANAPOLIS GAS CO. et al.**

**Nos. 8266–8268.**

Circuit Court of Appeals, Seventh Circuit.

June 10, 1943.

Rehearing Denied Aug. 2, 1943.

Morton G. Rosenberg, of New York City, James K. Northam, Donald L. Smith, and Walter Myers, Jr., all of Indianapolis, Ind., and Paul E. Kern and Karelsen & Karelsen, all of New York City, for appellants.

Louis B. Ewbank, W. H. Thompson, Perry E. O'Neal, and Patrick J. Smith, all of Indianapolis, Ind. (Sidney S. Miller, Corp. Counsel, and Archie N. Bobbitt, City Atty., both of Indianapolis, Ind., of counsel), for appellees.

Before EVANS, MAJOR, and KERNER, Circuit Judges.

KERNER, Circuit Judge.

These suits were separately brought by bondholders of the Indianapolis Gas Company[1] to recover interest claimed to be due upon the Gas Company coupons from April 1, 1936, to April 1, 1942. The Gas Company served a third-party complaint upon the city as third-party defendant, alleging that the city was or would be liable for any judgment recovered by the plaintiffs. The case was tried without a jury. The court found for the defendant and third-party defendant, and rendered judgments for costs against the plaintiffs, from which the plaintiffs separately appealed. Here, the appeals were consolidated for hearing and disposition.

The facts are not in dispute. Gillmor, a resident and citizen of Washington, in the District of Columbia, Abrams, a resident and citizen of the City of New York, and Pyramid, a New York corporation, are the owners of $12,000, $30,000 and $21,000 respectively, of the Gas Company bonds. The Pyramid suit is brought by it on its own behalf and on behalf of all other Gas Company bondholders similarly situated.

The bonds are part of an issue of $6,881,000 of First Consolidated Mortgage 5% Bonds dated October 1, 1902. Each of these bonds is in the principal sum of $1,000 and provides for the payment to bearer of interest thereon at 5% per annum in semiannual installments on April 1 and October 1 of each year until October 1, 1952. The interest payments are evidenced by coupons attached to the bonds. The bonds are secured by a mortgage deed of trust, dated October 1, 1902, conveying all of the then

---

[1] Hereinafter the parties will be referred to as follows: The Indianapolis Gas Company as the "Gas Company." The City of Indianapolis as the "City." Chase National Bank of the City of New York as the "Chase." Plaintiff, Daniel S. Gillmor, as "Gillmor." Plaintiff, Henry H. Abrams, as "Abrams." Plaintiff, Pyramid Commercial Corporation, as "Pyramid."

owned or after-acquired property of the Gas Company to the Trust Company of America and Ferdinand Winter as trustees. The Chase is, and has been for more than five years, the successor and sole trustee under this deed of trust. October 1, 1936, the Gas Company defaulted in the payment of the semi-annual interest due on the bonds and thereafter up to and including April 1, 1942.

In 1913, the Gas Company leased all of its properties for a term of ninety-nine years to the Citizens Gas Company, a company organized as a charitable trust under the laws of Indiana. In 1935, the Citizens Gas Company conveyed all of its assets to the city, and the city operated the entire system embracing both plants. The city, however, refused to accept an assignment of the Gas Company lease and contended that it was not liable thereunder. In March, 1936, the Gas Company and the city entered into a so-called "stand-still" agreement, pending the adjustment or court determination of the question of the city's liability under the lease. The city was permitted to continue the operation of the Gas Company properties, upon its agreement that it would deposit in escrow a sum equal to the semi-annual installments of interest due on the Gas Company bonds and a further sum equal to the dividends on the Gas Company stock. Pursuant to this agreement, the city deposited in escrow, from June 29, 1936, up to and including March 27, 1942, the total sum of $2,778,900.

In 1936, the Chase instituted an action in the United States District Court against the Gas Company, the city, and the Citizens Gas Company. In this action, the Chase sought a declaratory judgment holding that the lease was binding upon the city, and a coercive judgment for the interest which accrued on the Gas Company bonds on October 1, 1936. The District Court directed judgment in favor of the Chase and against the Gas Company for the accrued interest on the bonds. The Court, however, held that the city was not liable on the lease. June 6, 1940, this court, holding that the lease was binding on the city, reversed the decree of the District Court, Chase Nat. Bank v. Citizens Gas Co., 113 F.2d 217, and on November 10, 1941, the Supreme Court reversed this court upon the ground that the District Court lacked jurisdiction, 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47.

The lease, if valid as against the city, would bind it to restore the Gas Company's plant and turn it back in shape for operation at the expiration of the lease. But if the lease was invalid as against the city, that would not be true. For a more complete factual detail of proceedings prior to 1942, we refer to Consumers' Gas Trust Co. v. Quinby, 7 Cir., 137 F. 882; Quinby v. Consumers' Gas Trust Co., C.C., 140 F. 362; City of Indianapolis v. Consumers' Gas Trust Co., 7 Cir., 144 F. 640; Todd v. Citizens' Gas Co., 7 Cir., 46 F.2d 855; Williams v. Citizens Gas Co., 206 Ind. 448, 188 N.E. 212; Chase National Bank v. Citizens Gas Co., 7 Cir., 96 F.2d 363; Id., 7 Cir., 113 F.2d 217, and 314 U.S. 63, 62 S.Ct. 15, 86 L.Ed. 47.

In December, 1937, while the aforesaid action by the Chase was pending, the city brought an action in an Indiana state court against the Gas Company for a declaratory judgment that the ninety-nine year lease was not binding upon the city. This action remained pending in the Boone County State Court until May, 1942, when it was dismissed.

The record discloses that the property of the Gas Company was entangled with the city's (competing) plant; that $1,000,000 would have to be expended and six months to one year of time would be required to separate the two plants for separate operation; and that it would cost approximately $3,800,000 to put the Gas Company plant in condition for operation as a separate unit. There was evidence that it was impossible for the Gas Company to borrow the money needed to operate it as a separate plant. It further appears that the city could have duplicated the Gas Company's lines so as to furnish gas to all the consumers in Indianapolis at an expense of $2,500,000 and that the city had other advantages in manufacturing gas and coke. It also appears that expenses exceeding $300,000 had been incurred by the years of litigation, and that from September 19, 1936, the bonds had been excluded from sale on the New York Curb Exchange, except as dealt in "Flat," with all the defaulted interest coupons maturing October 1, 1936, and thereafter, attached.

Immediately after the decision of the Supreme Court, the Gas Company and the city entered into negotiations for the purpose of settling and compromising the controversies between them, and a conditional settlement was agreed upon, pursuant to which the Gas Company property would be sold to the city for $9,708,733.14, that being its

value. At this time, the bonded debt was $6,881,000, on which there had accrued coupon interest for six years of $2,064,300, making a total incumbrance of $8,945,300.

On March 16, 1942, by its circular letter, the Gas Company notified its bondholders of these negotiations and the terms of the settlement. The plan provided in essence: (1) The city was to pay $9,694,575.20 as of April 1, 1942, with interest at 2% per annum on $8,481,000 for any delay. (2) The company would convey all its physical property to the city, but would not warrant title as against the mortgage and taxes. (3) Each should release the other from all claims and demands. (4) The escrow fund might be used in making settlement. (5) Litigation in the State Court should be dismissed. (6) Bondholders should receive $1,120 per $1,000 bond, with 2% per annum after April 1, 1942, until consummation. (7) The Gas Company should pay certain fees and expenses. (8) The money to pay for said bonds should be deposited under an escrow agreement. (9) Like sums should be deposited for bondholders not agreeing. (10) A sum would be distributed to stockholders, expected to be approximately $39 per share. In this letter the Gas Company advised the bondholders that no interest had been paid on their bonds since April 1, 1936, because the city claimed it was not bound by the ninety-nine year lease; that as the result of the decision of the United States Supreme Court, the "ultimate outcome of the litigation, if continued, cannot be said to be free from doubt"; and that the litigation then pending in the Indiana state court may, "if the offer and plan of settlement * * * is not consummated, continue for a long period of time during which the interest on the bonds will continue in default."

The plaintiffs did not accept the plan, but between April 23 and May 6, 1942, more than a majority of the owners of the bonds did accept and agree to the plan, and as of January 25, 1943, $5,792,000 par value of such bonds, being 84.10% of the entire issue, were surrendered, and necessary funds to pay and take up the remainder of the bonds and coupons were deposited with the Chase. After more than 80% of the capital stock of the Gas Company had been voted by the owners of the stock in favor of the plan, the Gas Company, on April 27, 1942, conveyed all its property to the city.

The District Court found that the "Plan" did not unfairly discriminate against the plaintiff or any non-assenting bondholder, but was fair and equitable; that it gave to the bondholders more than they would likely have received as a result of litigation; and that the Gas Company and the majority of its bondholders and stockholders acted in good faith and with a view to protect the interests of all concerned in what they did in preparing, submitting and performing the "Plan."

In the view we take of the instant case, the question for decision is whether the plan was authorized by the terms of the mortgage deed of trust. If it was, and if there was sufficient notice in the bonds to make them subject to the conditions in the deed of trust, the judgment of the District Court must be affirmed.

The appellants, in urging a reversal, point to the fact that their bonds and coupons contain an express obligation to pay interest at 5% per annum until October 1, 1952, and that the interest which accrued from April 1, 1936, to April 1, 1942, has not been paid, and they contend that this express provision is not subject to limitation or restriction by any statement in the bonds.

To be sure, the general rule is that an express promise to pay principal and interest of a negotiable bond will not be held subject to any restriction or limitation by the provisions of a mortgage securing the bond, unless there is appropriate language on the face of the bond which gives the bondholders reasonable notice of such restriction or limitation. Oswianza v. Wengler & Mandell, 358 Ill. 302, 193 N.E. 123; Enoch v. Brandon, 249 N.Y. 263, 164 N.E. 45; and Guilford v. Minneapolis, etc., Ry. Co., 48 Minn. 560, 51 N.W. 658, 31 Am.St. Rep. 694.

In our case, each coupon sued on is attached to the bond for which it was intended to pay interest for a designated six months. The payment of interest on all these bonds ceased April 1, 1936, and the first of these suits was commenced by Gillmor on May 21, 1942. In that intervening six years, Gillmor actually acquired his bonds on March 29, 1938, after having been the beneficial owner since November 14, 1936. Abrams acquired his bonds in the months from May, 1941, and April 27, 1942, and Pyramid bought all of its bonds in May, 1942. It was stipulated that prior to the time plaintiffs purchased the bonds, they had notice of the litigation affecting the bonds and had actual notice that be-

cause of such litigation the Gas Company was unable to pay the coupons as they respectively matured, and that each plaintiff, when he purchased the bonds and coupons, had notice of their dishonor.

It also appears that each bond recites on its face that after continuance of a default in the payment of interest for six months, the bond "shall become due, in the manner and with the effect and subject to the conditions provided in the Indenture of Mortgage securing" it.

Of these "conditions" No. III provided that in case of default which should "continue for the space of six months * * * the Trustees" may, and shall upon request .in writing of the holders of a majority in amount of said bonds, do certain acts. But that "The Trustees may, however, in their discretion, resort to any proceedings legal or equitable, in their judgment necessary or expedient for the enforcement of the lien hereby created * * * or for the collection and conversion into money of any part of the trust estate," and No. VII provided that: "The action of the Trustees in regard to the enforcing to any extent or in any manner, the lien created by this mortgage, either by taking possession, sale at auction, or by resort to judicial proceedings, or by any means authorized and contemplated hereby, and any and every suit, bill or proceeding in equity, or other action which may in any manner be had or taken for enforcing the lien hereby created for the securing the payment of said bonds and coupons, or for enforcing any of the trusts of this instrument, shall be at all times subject to the control of the holders of a majority in amount of said bonds then outstanding, their wishes being expressed in writing.

"And it is further agreed that in case of any proceedings as hereinbefore authorized by reason of any default that may have occurred and continued as aforesaid a majority in interest of the bondholders, for the time being, shall have the right to agree upon a plan or scheme for reorganization, which plan or scheme, when so agreed upon in writing and signed by such majority in interest, shall be in all respects binding and obligatory upon all the holders of such bonds or coupons."

The plaintiffs contend that the recitals in the bond and the reference to the mortgage deed of trust merely govern and have to do with the mortgage, and cannot be deemed to modify or authorize a limitation of the express promise to pay interest as provided in the bond. With this contention we cannot agree.

The language in the bond was not such as to lead a holder to believe that it merely governed the mortgage deed of trust. We think it clearly indicated and plainly warned a bondholder purchasing his bond after a default in the payment of interest, that regardless of the express promise to pay contained in the bond and coupon, his rights were qualified and limited by the conditions contained in the mortgage deed of trust.

Section 19-402, Burns, Indiana Statutes 1933, defines a "holder in due course" and provides, among other things, that a holder in due course is one who became "the holder of it [the instrument] before it was overdue, and without notice that it had been previously dishonored." We have already observed that the payment of interest on all the bonds ceased April 1, 1936; that a default occurred on October 1, 1936; that each of the plaintiffs acquired his bonds and coupons with actual knowledge of their dishonor and after a default of six months in the payment of interest. Thus, the recital in the bond relative to the rights of a bondholder purchasing his bond after a default in the payment of interest, made applicable the condition that whatever action might be taken to secure payment of the bonds and coupons should be subject to the control of the holders of a majority of the bondholders, and the plaintiffs, as purchasers of the bonds, took and held the bonds subject thereto and were bound by the conditions. Guilford v. Minneapolis, etc., Ry. Co., 48 Minn. 560, 51 N.W. 658, 660, 31 Am.St.Rep. 694; Crosthwaithe v. Moline Plow Co., D.C., 298 F. 466; and Allan v. Moline Plow Co., 8 Cir., 14 F.2d 912.

As to the question whether the plaintiffs were bound by the action of a majority of the bondholders, we think an analogous situation arose in the case of Sage v. Central R. Co., 99 U.S. 334, 25 L.Ed. 394, involving the enforcement of the provisions of a mortgage securing bonds in which the bondholders had taken their bonds with knowledge of the agreement. In disposing of the contention of certain of the bondholders that they were not bound by the controlling power given to a majority of all the bondholders, the court, at page 339 of 99 U.S., 25 L.Ed. 394, said: "By the agreement, the entire body of the bond-

holders consented to place their interests * * * under the control of a majority of their number. * * * The purposes sought to be accomplished by it are manifest. * * * It was to secure the common interests of all the bondholders, in such a manner that none should obtain an advantage over the others. * * * The agreement, though unusual, was a reasonable one. While it prevented a small minority of the bondholders from forcing unreasonable and inequitable concessions from the majority, it did not empower that majority to crush out the rights of the minority, or subject them to any disadvantage. It authorized only such arrangements as would inure equally to the benefit alike of the majority and the minority."

In the case of Elwell v. Fosdick, 134 U. S. 500, 10 S.Ct. 598, 601, 33 L.Ed. 998, Elwell filed a cross-bill to foreclose a mortgage securing a large number of bonds. A foreclosure decree was entered and Elwell, as trustee, waived his right of appeal and executed a release. By the provisions of the mortgage, Elwell, as trustee, could proceed to collect the mortgage debt, by litigation or otherwise, only at the request of the holders of a majority of the bonds. A minority bondholder contended that Elwell had no authority as trustee to waive the right to appeal. It appeared that the holders of a majority of all the outstanding bonds desired the litigation to cease. The court held that the waiver and release bound all the bondholders, and stated that "No substantial reasons appear for permitting the bank, as the holder of only $14,000 of the bonds, to defeat the plainly expressed will of the holders of the remainder." In the light of these decisions we think the plaintiffs were bound by the action of a majority of the bondholders.

Plaintiffs have also stressed the point that Article VII is inapplicable for the reason that the conditions precedent required by that Article did not exist at the time of the offer and plan of settlement, and that the plan was neither framed nor submitted as a plan or scheme of reorganization. These we have considered, but they do not change the conclusions we have reached and because of the views we have already expressed, they need not be discussed.

The judgment of the District Court is affirmed.